# DL&G    DOUGLAS, LEONARD & GARVEY, P.C.

## A T T O R N E Y S

Charles G. Douglas, III*
C. Kevin Leonard
Carolyn S. Garvey
Benjamin T. King**
Megan E. Douglass
Jared J. Bedrick
Samantha J. Heuring

\* also admitted in MA
\*\* also admitted in ME

14 SOUTH STREET, SUITE 5
CONCORD, NEW HAMPSHIRE 03301

Telephone:  603-224-1988
Facsimile:  603-229-1988
Email:  mail@nhlawoffice.com
wwww.nhlawoffice.com

Friday, May 8, 2020

**VIA EMAIL:** humanrights@nh.gov; william.darling@nh.gov
**HAND DELIVERY TO FOLLOW**
Ahni Malachi, Executive Director
New Hampshire Commission for Human Rights
2 Industrial Park Drive, Bldg. One
Concord, NH 03301

        RE:    **Dr. Elizabeth Honigsberg v. Southern New Hampshire Health System,
                Foundation Medical Partners, and Southern New Hampshire Medical
                Center**

Dear Director:

        Enclosed for filing is a Charge of Discrimination on behalf of Dr. Elizabeth
Honigsberg. A hard copy with original signatures will be delivered on Monday, May
11, 2020. Thank you.

                                Sincerely,

                                *Samantha Heuring*

                                Samantha J. Heuring, Esq.

CC:    Dr. Elizabeth Honigsberg
Enclosures

Exhibit 1

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| X FEPA | |
| X EEOC | |

**New Hampshire Commission for Human Rights** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Dr. Elizabeth Honigsberg** | **1-716-864-5830** | **07/29/1976** |

| Street Address | City, State and ZIP Code |
|---|---|
| **34 Franklin Street #335** | **Nashua, NH, 03064** |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Foundation Medical Partners, Inc.** | **300+** | **1-603-577-2794** |

| Street Address | City, State and ZIP Code |
|---|---|
| **8 Prospect Street** | **Nashua, NH, 03060** |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Southern New Hampshire Medical Center** | **500+** | **1-603-281-8482** |

| Street Address | City, State and ZIP Code |
|---|---|
| **8 Prospect Street** | **Nashua, NH, 03061** |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

| | RACE | | COLOR | | SEX | | RELIGION | | NATIONAL ORIGIN |
|---|---|---|---|---|---|---|---|---|---|

| X | RETALIATION | | AGE | X | DISABILITY | | GENETIC INFORMATION |
|---|---|---|---|---|---|---|---|

| X | OTHER *(Specify)* — OTHER: FAMILIAL STATUS |

**NH RSA 354-A:7; NH RSA 354-19; 42 USC 12101, et seq., as amended.**

DATE(S) DISCRIMINATION TOOK PLACE

| Earliest | Latest |
|---|---|
| **11/12/2019** | **02/13/2020** |

| | CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**Third employer that I believe discriminated against me:**

**Southern New Hampshire Health System, Inc.**
**No. Employees, Members: 500+**
**8 Prospect Street**
**Nashua, NH, 06031**
**1-603-281-8482**

MEGAN E. DOUGLASS, Notary Public
My Commission Expires January 13, 2021

PLEASE SEE ATTACHED NARRATIVE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| | SIGNATURE OF COMPLAINANT |
| | X E Honi |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| 5/8/2020    X E Honi    *Charging Party Signature* | 5/8/2020 |

Megan E Douglass expires 1/13/21

Date

Exhibit 1

**Dr. Elizabeth Honigsberg**

v.

**Southern New Hampshire Health System
Foundation Medical Partners
Southern New Hampshire Medical Center**

---

## COMPLAINANT'S CHARGE OF DISCRIMINATION

---

**A.    Background: As joint employers, Respondents employed Dr. Honigsberg as a general surgeon.**

1. Dr. Elizabeth Honigsberg is a New Hampshire citizen residing in Nashua, New Hampshire.

2. Southern New Hampshire Health System (the System) includes both Foundation Medical Partners (FMP) and Southern New Hampshire Medical Center (the Medical Center). Exhibit A (the System's "About Us" page).

3. FMP is a multi-specialty provider group, including more than 300 providers in primary, specialty and immediate care serving patients in more than 70 practices across southern New Hampshire and northern Massachusetts. Exhibit A.

4. The Medical Center is an acute care facility in Nashua, New Hampshire with a medical staff of over 500 primary and specialty care providers from FMP, Dartmouth-Hitchcock Nashua, and local independent practices. Exhibit A.

5. On September 30, 2016, Dr. Honigsberg received a letter from Susan DeSocio, then-FMP President/CEO, offering Dr. Honigsberg a general surgery position on behalf of FMP and the System. Exhibit B.

6. On October 8, 2016, Dr. Honigsberg accepted the offer to join FMP and the System.

7. On November 25, 2016, Dr. Honigsberg signed an employment agreement, and the agreement was fully completed with the signature of Susan DeSocio on November 28, 2016. Exhibit C ("Physician Services Agreement").

1

Exhibit 1

8. The employment agreement provided that it was entered by and between Dr. Honigsberg and FMP, "an affiliate of" the System, and where FMP "has been organized for the purpose of promoting the lawful interests of" the Medical Center "by coordinating the delivery of health care." Exhibit C at pg. 1.

9. In addition, the employment agreement stated it was expressly contingent upon Dr. Honigsberg "obtaining and maintaining…full and unrestricted Medical Staff membership and clinical privileges at the Medical Center." Exhibit C at pg. 4.

10. Further, the agreement provided that Dr. Honigsberg's employment relationship with FMP was subject to automatic termination under terms set by the Medical Center: should she "cease to be an Active Member, as defined by the Medical Staff By-laws of the Medical Center, of the Medical Center's Medical Staff for any reason…this Agreement shall automatically terminate." Exhibit C at pg. 4.

11. Lastly, the agreement provided that Dr. Honigsberg's employment relationship with FMP was subject to automatic termination at any time for failure to comply with the bylaws, rules and regulations, and policies and procedures of the Medical Center as well as the Medical Center Medical Staff. Exhibit C at pg. 7, ¶ 7; pg. 5, ¶ 3.4(c).

12. Dr. Honigsberg's start date was on or about March 1, 2017.

13. Under the agreement, Dr. Honigsberg completed her initial two-year term.

14. Because no party to the agreement terminated the employment relationship, Dr. Honigsberg's employment renewed for an additional one-year term on or about on or about March 1, 2019.

**B.      The events that preceded and prompted Dr. Honigsberg's need for reasonable accommodation: after long-term suffering as the victim of domestic violence, Dr. Honigsberg developed a disability for which she required accommodation.**

15. Dr. Honigsberg's foremost priority as a surgeon is (and always has been) what one would hope all surgeons strive for: the health, safety, and overall well-being of all patients.

16. For the five years preceding Dr. Honigsberg's need for accommodation, she was the victim of insidious domestic violence. Yet, in spite of that, it never interfered with her work as a surgeon.

17. Although the abuse had escalated significantly during the last six months of the relationship, Dr. Honigsberg was nevertheless a stand-out doctor. On March 7,

2

Exhibit 1

2019, she was recognized by her superiors including Dr. Timothy Scherer, Chief Medical Officer for the Medical Center for the way that she handled a particular patient. This patient was frustrated by the treatment he'd received from others at the Medical Center, but Dr. Honigsberg was able to turn that patient's experience around through her patience, compassion, and dedication. Exhibit D.

### Dr. Honigsberg's meeting with Dr. Scherer

18. Due to the escalating abuse, it was in early or mid March of 2019 that — for the first time — Dr. Honigsberg's struggle with domestic violence came to the attention of Dr. Timothy Scherer, Chief Medical Officer for the Medical Center.[1]

19. Dr. Scherer called Dr. Honigsberg into his office and made inquiry into whether Dr. Honigsberg's situation was as dire as he was told.[2]

20. Dr. Scherer then suggested that the domestic violence Dr. Honigsberg suffered at home interfered with her medical judgment. In particular, Dr. Scherer raised that Dr. Honigsberg had transferred a patient from the emergency room to a tertiary care center. When Dr. Honigsberg explained that she transferred the patient due to the lack of critical care resources at the Medical Center, Dr. Scherer appeared to agree with her judgment.

21. Dr. Scherer then discussed Dr. Honigsberg's safety plan[3] with her. Once she described her safety plan to him in detail, Dr. Scherer seemed satisfied that Dr. Honigsberg had done all that she could.

### Dr. Honigsberg's meeting with Dr. Dorf

22. Shortly thereafter on March 22, 2019 Dr. Honigsberg received an email from Dr. Robert Dorf, then-Chief Medical Officer of FMP, requesting to schedule a meeting during Dr. Honigsberg's non-working hours.[4]

---

[1] Dr. Scherer's role as Chief Medical Officer for the Medical Center placed him in a supervisory capacity over Dr. Honigsberg.

[2] The source of Dr. Scherer's information is unknown.

[3] The term "safety plan" as used herein references the plan that Dr. Honigsberg developed to leave the abusive environment (i.e., having bags packed and ready, a pre-determined safe place to go, cash on hand, and local police department contact information at the ready).

[4] Dr. Dorf's role as Chief Medical Officer of FMP placed him in a supervisory capacity over Dr. Honigsberg.

Exhibit 1

23. Dr. Honigsberg indicated to Dr. Dorf that she was unable to attend at that time due to a change in her childcare schedule, and she asked if there was a time later that day or on another day that the two could meet. Exhibit E at pg. 2.

24. Dr. Dorf ignored Dr. Honigsberg's inability to attend the meeting he requested during non-work hours due to changes in her childcare. Exhibit E at pg. 2.

25. Instead, he replied, "Its kinda important and **hopefully only once**." Exhibit E at pg. 2.

26. Dr. Honigsberg therefore stated that while she was unable to rearrange childcare due to recent changes in her life, she would accommodate Dr. Dorf's schedule to the best of her ability. She also asked Dr. Dorf what the requested meeting was about. Exhibit E at pg. 2.

27. Finally, Dr. Dorf stated that the two could meet at the end of the day. In regard to why he wanted to meet, Dr. Dorf stated that he had "been hearing some things." In addition, Dr. Dorf said that he was aware of conversations that Dr. Honigsberg had with Dr. Scherer. Exhibit E at pg. 2.

28. Dr. Honigsberg met with Dr. Dorf as scheduled. During the meeting, Dr. Dorf seemed skeptical of the domestic violence that Dr. Honigsberg was suffering and suggested that she might be overstating the dangerous situation she was experiencing at home.

29. Further, Dr. Dorf implied that Dr. Honigsberg's suffering from domestic violence was a blemish upon and an inconvenience to the surgical practice. This was so apparent to Dr. Honigsberg that she felt compelled to ask Dr. Dorf what emergency department she should go to should her abuser beat her or try to kill her so as to avoid "a scandal" for the practice.

30. While Dr. Dorf indicated that Dr. Honigsberg should come to their emergency room should the need arise, he also told Dr. Honigsberg: "You are not the same woman that I hired."

31. Dr. Dorf then discussed Dr. Honigsberg's safety plan with her. Like Dr. Scherer, Dr. Dorf seemed satisfied with the safety plan.

**The June 3, 2019 Incident**

32. On the evening of June 3, 2019, an incident of domestic violence occurred toward Dr. Honigsberg which triggered her disability and need for reasonable accommodation thereto.

4

Exhibit 1

33. Within about a week of this incident, Dr. Honigsberg was formally diagnosed with acute post-traumatic stress disorder (PTSD) as a result of the domestic violence she suffered which culminated in the events of June 3.

34. Dr. Honigsberg therefore took leave under the Family and Medical Leave Act (FMLA) from June 4 until mid August of 2019.

35. On August 22, 2019, Dr. Richard Tomb, one of Dr. Honigsberg's treating physicians, completed a SNHHS ADA Certification Form requesting the accommodation of leave time through November 1, 2019.

36. Dr. Honigsberg provided the August 22 Form to SNHHS's Employee Health Services Department, and the request for ADA leave time was subsequently granted.

37. Throughout the entire time that Dr. Honigsberg was away from work, she stayed in near constant contact with various representatives of her employer in an attempt to either keep her employer updated as to her expected return to work date or to ask for help navigating the professional ramifications of her new reality.

38. Many of Dr. Honigsberg's requests for help were ignored.

**C.    Respondents retaliated against Dr. Honigsberg for engaging in protected activity, discriminated against Dr. Honigsberg on the basis of disability, and discriminated against Dr. Honigsberg on the basis of familial status.**

39. On October 31, 2019, Dr. Michelle Ronayne, Dr. Honigsberg's treating therapist for her PTSD, completed a SNHHS ADA Certification Form requesting two accommodations: first, the accommodation of 4-6 weeks of additional leave time and, second, the accommodation of double scrubbing[5] with another surgeon until such time that Dr. Honigsberg was reacclimated to work and therefore confident enough that she could return to independent surgical practice.

40. Dr. Dorf addressed the October 31 Form and Dr. Honigsberg's corresponding requests for accommodation by way of letter dated November 12, 2019. Exhibit F.

41. Dr. Dorf's letter stated that Dr. Honigsberg's first accommodation request (an additional 4-6 weeks of leave time) was granted. Exhibit F.

---

[5] The term "double scrubbing" as used herein means that two surgeons perform surgery together, as opposed to a single surgeon performing surgeries alone.

5

Exhibit 1

42. However, Dr. Dorf's letter further stated that Dr. Honigsberg's second accommodation request of double scrubbing — which request would have enabled Dr. Honigsberg to return to work and perform her position's essential functions as early as December 1 — was denied. Exhibit F.

43. The language of Dr. Dorf's letter indicated that Dr. Honigsberg's double scrubbing accommodation request was denied **because** her "absence," a protected activity where such "absence" was an ADA reasonable accommodation, had inconvenienced the surgical department. Exhibit F.

44. More specifically, Dr. Dorf's letter stated the following with regard to Dr. Honigsberg's requested accommodation for her return to work:

> "To require the surgical team to double scrub **with you** would be an undue hardship. **Your absence** has resulted in less surgical resources and, in order to safely care for patients, we have no capacity to accommodate double scrubbing. The ability for our surgeons to operate independently is a critical component of our ability to provide timely and safe surgical care."

> Exhibit F.

45. On December 9 2019, Dr. Honigsberg (via legal counsel) sent Dr. Dorf a revised request for reasonable accommodation. Exhibit G.

46. Therein, Dr. Honigsberg informed Dr. Dorf that, with Dr. Ronayne's continued treatment and assessment of Dr. Honigsberg's disability and capabilities, Dr. Ronayne had determined that the accommodation requested in the October 31 ADA Form was no longer necessary. Exhibit G at 2.

47. Rather, after evaluating Dr. Honigsberg's limitations and capabilities in light of the essential functions of Dr. Honigsberg's position, Dr. Ronayne concluded that Dr. Honigsberg would require double scrubbing only on the most challenging and complex surgical procedures and only until Dr. Honigsberg re-acclimated to the operating room and to performing difficult procedures. Together, Dr. Honigsberg and Dr. Ronayne drafted a revised request for accommodation which was attached to the December 9 letter. Exhibit G at 2.

48. Additionally, the December 9 request clarified that the requested accommodation was for a very limited duration. Exhibit G at 2.

49. Dr. Honigsberg drew analogy to the experience of Dr. Jo Buyske, Executive Director of the American Board of Surgery (ABS), who was absent from surgical

Exhibit 1

practice for two years but required only a period of several days to readjust to surgical practice. Exhibit G at 2.

50. At the time of the request, Dr. Honigsberg had been absent from surgical practice for only six months. Exhibit G at 2.

51. Dr. Honigsberg submitted the request to Dr. Dorf with patient safety in mind, and she modeled her request after the ABS Guidelines for surgeons re-entering active surgical practice endorse a "proctoring plan," such as double scrubbing. Exhibit G at 2.

52. The December 9 request further set forth multiple reasons why the revised accommodation was both reasonable and feasible. Exhibit G at 3-4.

53. Though she need not have done so, Dr. Honigsberg even offered to take on a call schedule commensurate with the time she had missed, offered to become the "surgical nocturnist" to relieve the rigors of the call schedule for other surgeons, and offered to take on roles less appealing to her fellow surgeons such as roles in the Wound and Obesity Clinics. Exhibit G at 4.

54. After receiving Dr. Honigsberg's December 9 letter which was accompanied by a signed letter from her doctor, FMP first directed Dr. Honigsberg to instead have her doctor complete an additional ADA form.

55. On December 17, 2019, Dr. Honigsberg complied with that directive Exhibit H.

56. Second, FMP further directed Dr. Honigsberg to reach out to Dr. Dorf directly, as opposed to doing so through legal counsel, to request reasonable accommodation.

57. On December 23, 2019, Dr. Honigsberg complied with that directive. Exhibit I.

58. Third, FMP directed Dr. Honigsberg to provide a letter from her doctor to Employee Health Services stating that she was cleared to return to work.

59. On December 30, 2019, Dr. Honigsberg complied with that directive. Exhibit J.

60. On January 7, 2020, two weeks had passed since Dr. Honigsberg's December 23 request for accommodation was sent to Dr. Dorf as FMP had instructed, and Dr. Honigsberg still had not heard from Dr. Dorf or any other FMP representative regarding her accommodation request.

Exhibit 1

61. Dr. Honigsberg therefore instructed her legal counsel to reach out to FMP's counsel regarding the delay in response.

62. This inquiry prompted Dr. Dorf's assertion that he replied to Dr. Honigsberg's accommodation request on December 31, 2019, but had mistakenly sent the email to Dr. Honigsberg's work email address.

63. At that time, Dr. Dorf knew that Dr. Honigsberg did not have access to her work email.

64. On January 8, 2020, Dr. Honigsberg finally heard from Dr. Dorf, and he asked her to meet with the surgical leadership team to discuss reasonable accommodations.

65. On January 10, Dr. Honigsberg agreed to the meeting, and she asked Dr. Dorf to identify the individuals who would be in attendance. Further, so that she could focus her full attention on the meeting itself, Dr. Honigsberg asked Dr. Dorf is he would consent to her bringing either a note-taker or to her recording the meeting.

66. In response to Dr. Honigsberg's question about who would be attending the meeting, Dr. Dorf responded with, "all people you have worked well with in the past and who know you."

67. Dr. Dorf did <u>not</u> consent to Dr. Honigsberg's request to bring a note taker, nor did he consent to Dr. Honigsberg's request to record the meeting.

68. On January 21, all parties finally agreed to meeting date.

### The January 28th Meeting

69. On January 28, Dr. Honigsberg met with Dr. John Flannery, Dr. Nick Tsparlis, Dr. Ken Howe ("the Surgeons") and Dr. Dorf.

70. The meeting lasted just under 30 minutes.

71. At the beginning of the meeting, Dr. Honigsberg attempted to explain that her absence and need for accommodation was not due to a divorce or to moving, as rumors might have indicated, but that it was due to a genuine disability and resulting limitations.

72. However, Dr. Dorf interrupted her, stating that he wanted to avoid discussing the reason for her absence, and he did not want to "make this a personal thing."

8

Exhibit 1

73. During the meeting, Dr. Honigsberg proposed several alternative accommodations and/or ideas that could be implemented in addition to those already requested.

74. Dr. Honigsberg did so in an effort to make the accommodation period easier for the surgical department.

75. The Surgeons and/or Dr. Dorf immediately rejected each of those proposed alternatives and gave Dr. Honigsberg's proposed accommodations not even a moment of consideration.

76. For example, Dr. Honigsberg proposed that she might perform emergency surgeries only.

77. She thought this proposal would be well received because it would give the other surgeons the freedom to pursue their individual elective practices, a generally sought after opportunity among surgeons.

78. Further, performing emergency surgeries only would have provided Dr. Honigsberg the ability to rebuild her confidence in the operating room by doing something she was familiar with as she had performed emergency surgeries for over 6 years.

79. That proposal was rejected.

80. Second, Dr. Honigsberg proposed that she could return all of the coverage that other surgeons have provided, particularly call coverage, which is something generally despised by surgeons.

81. Again, that proposal was rejected.

82. In reply to that proposal, Dr. Tsparlis stated "we are way past that point."

83. Third, Dr. Honigsberg also proposed that she might become a "nocturnist" surgeon.

84. Dr. Honigsberg thought this proposal might be appealing because it would make it so that the other surgeons did not have to work at night.

85. Again, that proposal was rejected.

9

Exhibit 1

86. Dr. Flannery and Dr. Howe indicated that, with respect to Dr. Honigsberg's request for a double scrubbing accommodation, the department would not be willing to call another surgeon in at night for double scrubbing.

87. Dr. Honigsberg then proposed that the assistance of a Physician's Assistant (PA), as opposed to a surgeon, might satisfy her need for accommodation.

88. Rather than expect the department to pay for a PA to do so, Dr. Honigsberg offered to pay for the expense of PA assistance out of her own pocket.

89. Again, that proposal was rejected.

90. Dr. Honigsberg was told that PAs only work until 5:00 PM, and the department is not willing to have PAs work at night as it would "disrupt the current structure."

91. Dr. Honigsberg then reiterated that, like her December 9 letter had stated, she anticipated needing to double scrub on only a few cases and for a very limited duration of time.

92. More specifically, Dr. Honigsberg stated to the effect of: "All I am asking for is to double scrub in on a few cases like a colon case with John [Flannery], a bowel obstruction case with Nick [Tsparlis], or a [Sanjay] Gupta gallbladder. Jo Buyske [ABS Executive Director] only needed a few days to get back into the OR [operating room]."

93. Neither the Surgeons nor Dr. Dorf responded to that statement.

94. Although the Surgeons and Dr. Dorf rejected all of Dr. Honigsberg's proposals without consideration, neither the Surgeons nor Dr. Dorf proposed a single accommodation during the meeting.

95. Rather, the Surgeons and Dr. Dorf made clear that two conditions needed to be satisfied before Dr. Honigsberg could return to work: (1) Dr. Honigsberg either would need to be non-disabled or be able to work without any accommodations; and (2) Dr. Honigsberg would need to make special arrangements to ensure that her role as a mother would not interfere with her role in the department.

96. When Dr. Flannery asked Dr. Honigsberg when she could return, she reiterated that she was cleared to return as of December 1st, and could have returned on December 1st, so long as she was reasonably accommodated.

Exhibit 1

97. Dr. Honigsberg further explained that, at that time, she could return as soon as FMP agreed to provide a reasonable accommodation <u>and</u> such accommodation was cleared by her treatment team.

98. This explanation was not accepted by the Surgeons.

99. Instead, the Surgeons asked, "but we thought you were already cleared?"

100. In response, Dr. Honigsberg attempted to explain that, since October of 2019, she had significantly reduced her requested accommodations several times both because FMP had not approved them and because her disability had continued to improve such that she was able to reduce the accommodations requested in an effort to make it easier for FMP to accommodate her.

101. Dr. Howe then asked Dr. Honigsberg, "when do you plan on **working like the rest of us**?"

102. Dr. Honigsberg understood that "working like the rest of us" could only have one meaning: when she would no longer be disabled and/or no longer require accommodation.

103. Since Dr. Flannery does not take general surgery call and Dr. Howe does not perform acute care surgeries, no other meaning was plausible.

104. Finally, Dr. Flannery mentioned Dr. Honigsberg's children.

105. He then instructed Dr. Honigsberg that "you [she] must have a nanny."

106. Dr. Honigsberg explained that she had intended to hire a nanny but, due to her return to work having been extended significantly beyond December, her financial situation prohibited her from doing so.

107. Dr. Flannery responded, "okay, but the nanny thing is required."

108. Toward the end of the meeting when the subject of holiday call came up, Dr. Honigsberg stated that she would be willing to cover nearly all holiday call with the exception of Mothers' Day and Halloween, but noted that there was some uncertainty because a parenting schedule for Christmas and her kids' birthdays had not yet been worked out.

109. In response, Dr. Howe shook his head and rolled his eyes.

11

Exhibit 1

**D.    The aftermath of the January 28th meeting: Respondent grossly mischaracterized the meeting and manufactured false information to create a pretext for unlawfully terminating Dr. Honigsberg's employment.**

110. More than a week had passed since the meeting and Dr. Honigsberg had not heard from Dr. Dorf nor any of the Surgeons.

111. She therefore sent Dr. Dorf a follow up email on February 6, 2020. Exhibit K.

112. Therein, Dr. Honigsberg fully described what transpired during the meeting. Exhibit K.

113. Dr. Honigsberg further asked whether FMP would propose alternative accommodations or whether FMP had reconsidered the many accommodations she had suggested, and she encouraged Dr. Dorf to reach out to her if she could be of any assistance to FMP while it considered her accommodation requests. Exhibit K.

114. Lastly, Dr. Honigsberg stressed both that she was eager to return and the significant delay was causing her significant harm including financial peril and the looming threat of losing her licensing credentials. Exhibit K.

115. On February 11, Dr. Honigsberg emailed Dr. Dorf to update him regarding long-term disability benefits because FMP's insurance carrier had reached out to her. Dr. Honigsberg advised that, while she would be willing and capable or returning to work as soon as FMP approved accommodation(s), she decided to complete the application process because, if approved, she would receive back pay benefits back to the date that lost her short-term disability benefits. That occurred when Dr. Ronayne cleared Dr. Honigsberg to return to work as early as December 1. Exhibit L.

116. By February 17, Dr. Honigsberg still had not heard from Dr. Dorf.[6]

117. She therefore sent another follow up email asking whether FMP had made any progress with respect to a reasonable accommodation. Dr. Honigsberg proposed yet another reasonable alternative accommodation for FMP's consideration, and she reiterated the harm she suffered due to her prolonged absence. Exhibit M.

118. On February 19, Dr. Honigsberg was shocked when she received a letter from Dr. Dorf terminating her employment without cause.

[6] By this date, Dr. Dorf had already mailed Dr. Honigsberg's termination letter. However, she did not open it and read until February 19. Thus, Dr. Honigsberg believed she was still employed when she sent the February 17 follow up email.

12

Exhibit 1

119. The fact of her termination alone was shocking enough, but it was even more disturbing that the letter grossly mischaracterized the discussion at the meeting and manufactured false information as a means of generating a pretext for the Respondent's unlawful conduct.

120. The termination letter grossly mischaracterized the accommodations Dr. Honigsberg proposed during the January 28 meeting.

121. The termination further letter alleged that Dr. Honigsberg repeatedly insisted on raising her "concerns about getting consistent childcare."

122. That allegation is **patently false**. See Exhibit K (Dr. Honigsberg's February 6 email documenting what transpired at the meeting).

123. The termination letter alleged that Dr. Dorf and the Surgeons did not want to discuss Dr. Honigsberg's child care circumstances, but fails to address that Dr. Flannery stated "you must have a nanny" and "the nanny thing is required." See Exhibit K (Dr. Honigsberg's February 6 email documenting what transpired at the meeting).

124. The termination letter alleged that Dr. Honigsberg said she could not handle perfection for surgery.

125. That allegation is **patently false**. See Exhibit K (Dr. Honigsberg's February 6 email documenting what transpired at the meeting).

126. The termination letter alleged that Dr. Honigsberg said she could only handle patients who were going to die anyway.

127. That allegation is **patently false**. See Exhibit K (Dr. Honigsberg's February 6 email documenting what transpired at the meeting).

128. The termination letter alleged that Dr. Honigsberg indicated that trauma surgery does not require a surgeon to perform at their best.

129. That allegation is **patently false**. See Exhibit K (Dr. Honigsberg's February 6 email documenting what transpired at the meeting).

130. The termination letter alleged that Dr. Honigsberg made casual references to the death of patients.

131. That allegation is **patently false**. See Exhibit K (Dr. Honigsberg's February 6 email documenting what transpired at the meeting).

Exhibit 1

132. The termination letter alleged that Dr. Honigsberg requested an accommodation which would adversely affect patient safety.

133. That allegation is **patently false**. See Exhibit K (Dr. Honigsberg's February 6 email documenting what transpired at the meeting).

134. The termination letter alleged that Dr. Honigsberg failed to appreciate the need to provide the highest quality of care for patients at all times.

135. That allegation is **patently false**. See Exhibit K (Dr. Honigsberg's February 6 email documenting what transpired at the meeting).

136. In addition to Dr. Honigsberg's termination letter, Respondent made yet another attempt to grossly mischaracterize the nature of Dr. Honigsberg's termination and shelter itself under the blanket of pretext when Respondent sent Dr. Honigsberg two letters and, therein, falsely characterized her termination as a resignation. Exhibit N.

137. At every step of the way, Dr. Honigsberg's sole focus has been to protect and ensure the safety of her patients. The very reason that Dr. Honigsberg wanted to double scrub for a limited period of time was to ensure that, after having been away from active surgical practice for six months, she was able to return and practice safely. That request provided no benefit to Dr. Honigsberg personally.

138. It is both shameful and unlawful that Dr. Honigsberg's commitment to patient safety, and her request for reasonable accommodation to ensure patient safety, came at the expense of her job because Respondents deemed accommodating Dr. Honigsberg's disability too much of a bother.

139. Furthermore, Respondents' claim that it was an undue burden to provide Dr. Honigsberg the reasonable accommodation of double scrubbing does not withstand scrutiny.

140. First, although Dr. Dorf's November 12 letter references a decrease in surgical resources to support Respondents' contention that double scrubbing was not feasible, no such change in surgical resources occurred other than the addition of three Physician assistants.

141. Second, double scrubbing was feasible.

142. When Dr. Flannery began his solo practice, it was proposed that Dr. Honigsberg help Dr. Flannery by double scrubbing with him.

14

Exhibit 1

143. Notably, that was before the department added three Physician assistants.

144. Third, Dr. Honigsberg has previously double scrubbed with Dr. Luis Jiminez on numerous occasions.

145. Both when Dr. Honigsberg double scrubbed with Dr. Jiminez <u>and</u> when it was proposed that she double scrub with Dr. Flannery, there was <u>never any indication</u> that double scrubbing was not feasible.

146. Both when Dr. Honigsberg double scrubbed with Dr. Jiminez <u>and</u> when it was proposed that she double scrub with Dr. Flannery, there was <u>never any indication</u> that double scrubbing was an "undue hardship."

147. Both when Dr. Honigsberg double scrubbed with Dr. Jiminez <u>and</u> when it was proposed that she double scrub with Dr. Flannery, there was <u>never any indication</u> that double scrubbing would prohibit safe care from being rendered to patients.

148. Only when <u>Dr. Honigsberg</u> needed to double scrub did it become infeasible, an undue hardship, and unsafe for patients.

E.   <u>Under both state and federal law, Respondent is liable for its unlawful conduct and the significant harm that such conduct caused Dr. Honigsberg.</u>

149. Dr. Honigsberg is "disabled" within the meaning of the law because her performance of one or more major life activities is substantially limited by her disability of acute PTSD.

150. Dr. Honigsberg is a "qualified individual" because she possesses the requisite skill, experience, education, and other job-related requirements for the general surgeon position which she held, and she was able to perform her position's essential functions with or without a reasonable accommodation.

151. Respondents had a duty to accommodate Dr. Honigsberg's disability upon her return to work where a reasonable accommodation would have enabled her to perform her position's essential functions and where such accommodation was feasible for the employer.

152. That Respondents had accommodated Dr. Honigsberg prior to her return through providing leave time does not absolve Respondents of the duty to provide reasonable accommodation upon her return, because that is a continuing duty.

15

Exhibit 1

153. Nor were Respondents permitted to retaliate against Dr. Honigsberg for her protected activity of requesting reasonable accommodation between August and December of 2019.

154. Nevertheless, Respondents revealed their motives and retaliatory conduct when Respondents told Dr. Honigsberg that "your [her] absence" was the reason that her double scrub accommodation request was denied.

155. Dr. Honigsberg's requests for accommodation triggered Respondents' duty to engage in the interactive process in good faith to work together with Dr. Honigsberg to assess whether her disability could be reasonably accommodated.

156. However, Respondents' immediate rejection of, and Respondent's failure to consider even for a moment, all accommodations proposed by Dr. Honigsberg demonstrate that Respondents did not engage in the interactive process in good faith.

157. Further, Respondents' failure to propose even a single accommodation, despite rejecting all accommodations requested by Dr. Honigsberg, demonstrate that Respondents never intended to accommodate her at all.

158. Had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would have enabled Dr. Honigsberg to perform her job's essential functions.

159. However, that Respondents had no intention of engaging in a good faith interactive process nor in accommodating Dr. Honigsberg's disability such that she could return to work is plain from Respondent's conduct.

160. On that point, Respondents' statement to the effect that "we [the surgical practice] are way past that point" in response to Dr. Honigsberg's proposals is telling.

161. Respondents discriminated against Dr. Honigsberg when they refused to provide a reasonable and feasible accommodation to her disability.

162. Respondents revealed their intent to discriminate against Dr. Honigsberg on the basis of her disability when Respondents asked Dr. Honigsberg, "when do you plan on working like the rest of us?"

163. Furthermore, Respondents discriminated against Dr. Honisgberg on the basis of familial status when Respondents told her she would be required to obtain a nanny as a pre-condition to her return to work.

16

Exhibit 1

164. Respondent's discrimination on the basis of familial status is further revealed by the fact that Dr. Howe shook his head and rolled his eyes when Dr. Honigsberg mentioned her children in relation to the holiday call schedule.

165. Rather than provide Dr. Honigsberg with double scrubbing, a reasonable and feasible accommodation, Respondent elected to instead deny that request for accommodation in retaliation to Dr. Honigsberg's protected activity under 354-A and the ADA.

166. Rather than engage in the interactive process in good faith to work together with Dr. Honigsberg to assess whether her disability could be reasonably accommodated upon her return to work, Respondent elected to instead engage in a bad faith, sham of an interactive process.

167. Rather than engage in the interactive process in good faith to work together with Dr. Honigsberg to assess whether her disability could be reasonably accommodated upon her return to work, Respondent elected to instead terminate Dr. Honigsberg's employment.

168. Rather than consider Dr. Honigsberg's skills and qualifications as a surgeon, Respondents elected to instead use her familial status as motivating factor in terminating her employment.

169. Dr. Honigsberg has suffered significant emotional and economic losses as a result of Respondent's violations of 354-A and the ADA.

Exhibit 1

Click here for COVID-19 Updates and Information and the latest SNHH Updates

southern
new hampshire
health

WE ARE **SOLUTION**HEALTH

Careers | Contact Us | Support SNHH | About Us | SNHHQ

Search

About Us

Our Mission and Vision >

Senior Leadership >

Code of Conduct >

Affiliations and Partnerships

Our
Services

Our
Locations

Billing and
Insurance

Visiting Southern NH
Medical Center

Find a
Doctor

Make an
Appointment

Patient
Portal

Pay
Bi

Emergency Management

SNHH Blog

Simply Healthy Podcast

Our History

Home  /  About Us

# About Us

Southern New Hampshire Health, includes:

- **Southern New Hampshire Medical Center,** a 188-bed acute care facility located in the heart of downtown Nashua, has a medical staff of over 500 primary and specialty care providers from Foundation Medical Partners, Dartmouth-Hitchcock Nashua, and local independent practices.

- **Foundation Medical Partners,** a multi-specialty provider group, including more than 300 providers in primary, specialty and immediate care serving thousands of patients in more than 70 practices across southern New Hampshire and northern Massachusetts.

- **Immediate Care,** offering walk-in care 7 days a week at 7 locations.

We're dedicated to improving your health and wellbeing with innovative programs and preventive health resources.

**A Member of SolutionHealth**

SolutionHealth is a regional healthcare organization that represents a combination of Southern New Hampshire Health and Elliot Health System. The founding vision of SolutionHealth is to provide highly-coordinated, community-based regional healthcare through collaborative planning to increase access, quality, value and community benefit for residents of southern NH. **Learn more.**

**A Partner with Boston's Top Teaching Hospital**

We are Massachusetts General Hospital's first clinical affiliate in the region. This affiliation gives you easy access to world-class treatment, with joint programs in stroke, cancer, trauma, vascular surgery and pediatric specialties.

**Leaders in Care Delivery**

Through Foundation Medical Partners, we're redesigning primary care. Patients in our primary care practices are part of a patient centered medical home (PCMH), a new model for care delivery. Team-based and tightly coordinated, medical homes can improve care at lower costs. Learn more about PCMH.

## Our Mission and Vision

**Mission**



Exhibit 1

Southern New Hampshire Health is dedicated to providing exceptional care that improves the health and well-being of individuals and the communities we serve.

## Vision

Southern New Hampshire Health is a provider of choice, delivering convenient access to high value, quality care in an environment that embraces dignity, compassion and service to the people of our community.

## Our Beliefs

A higher level of care means we believe in treating you the way we would like to be treated.

It starts with empathy — listening to how you feel and working to understand your needs.

It continues with respect — spending quality time to explain care and services in a way that everyone can understand.

Communication is important — we work as a team to keep everyone, including you and your family, informed about your care.

Relationships are built on trust — something that is yours to give, and ours to earn, in everything we do.

Our dedication to a higher level of care is more than words. It takes expertise, knowledge and commitment. We work every day to deliver the best possible care, tailored to your needs, with support and understanding.

About Us

Our Mission and Vision >

Senior Leadership >

Code of Conduct >

Affiliations and Partnerships

Community Health

Nursing & Patient Care Services

Awards & Accreditations

Emergency Management

SNHH Blog

Simply Healthy Podcast

Our History

## Senior Leadership

### Executive Team

**Colin McHugh, Interim President, Southern NH Health System, Vice President, Value Innovation, SolutionHealth, Executive Director, SolutionHealth Accountable Care Organization**
Colin joined the SolutionHealth Team in 2019 with over 25 years of healthcare experience to lead the organization's value-based and accountable care strategy.  In April of 2020, he was named Interim President of Southern NH Health System.  Prior to joining SolutionHealth, Colin served as Senior Vice President of Network Development and Contracting for MaineHealth and as Executive Director of the Maine Heart Center, a financially and clinically integrated cardiovascular care network.  In those roles he successfully developed and led an enterprise-wide strategic contracting function across eight local health systems, including Maine's most comprehensive behavioral health network. Colin has also served in executive roles with Anthem Blue Cross Blue Shield, leading fee-for-service and value-based contracting activities.

**Robert Dorf, DO, President, Foundation Medical Partners**
Dr. Dorf joined Foundation Medical Partners in 2004 as a Family Practice physician. He served as Quality Director from 2005-2007 before moving on to Chief Medical Officer in 2008. In 2019, Dr. Dorf was appointed the President of Foundation Medical Partners.  Dr. Dorf graduated from the University Of New England College Of Osteopathic Medicine in Biddeford, Maine, and completed a residency at St. Joseph Hospital and Medical Center in Paterson, NJ and is a Fellow to the American Academy of Family Practice (AAFP).

**Kathryn E. Skouteris, Esq., Senior Vice President/Chief Administrative Officer & General Counsel**
Ms. Skouteris joined the organization in 2016 as its General Counsel and held several

Exhibit 1

other leadership positions prior to her appointment to Chief Administrative Officer in 2019.  She began her legal career practicing law in Boston before transitioning to public service, where she served as General Counsel then as Assistant Commissioner for the New Hampshire Department of Revenue Administration. She earned a BA from the University of New Hampshire and a JD from Suffolk Law School. She is admitted to practice in both New Hampshire and Massachusetts.

**Paul L. Trainor, Senior Vice President of Finance, Chief Financial Officer**
Mr. Trainor joined the organization in 2007.  He has held various finance positions with Optima Health, Elliot Hospital and Catholic Medical Center, Manchester, NH. He has a BS degree in accounting from Bentley College and a Master of Health Care Management from New England College.

**Mark Santos, R.Ph., MBA, CMPE, Senior Vice President/Business Development and Chief Operating Officer, Foundation Medical Partners**
Mr. Santos joined Foundation Medical Partners in 2007 and was promoted to Chief Operating Officer in 2016. In 2019, he assume the additional role of SVP/Business Development for the Health System in addition to his duties for Foundation Medical Partners.  His prior positions were with Harvard Pilgrim Care and Harvard Vanguard Medical Associates. Mr. Santos is a graduate of Massachusetts College of Pharmacy with a BS in Pharmacy and he completed an MBA degree at Rivier College.

## Senior Management Team

**Elizabeth Armstrong, Vice President, Surgical and Acute Care Services**
Ms. Armstrong was first employed by Foundation Medical Partners in 1995 as a Director of Internal Medicine and Medical Specialties. She left the organization in 2000 and returned in 2005 to manage several physician practices, including certain practices that have a clinical affiliation with Massachusetts General Hospital. In 2014, Ms. Armstrong assumed the additional position of Associate VP of Surgical Services and in 2019 she was promoted to her current position. She is a graduate of University of Maine and earned an MBA from the University of Massachusetts.

**Rebecca Cooper-Piela, Chief Quality Officer**
Ms. Cooper-Piela MS, APRN-BC joined Foundation Medical Partners in 1995 as a primary care provider. She is a board certified adult nurse practitioner. She became involved in medical leadership when she joined the Board of Governor's; serving from 1997 to 2003 and again in 2007 through 2009. Ms. Cooper-Piela began her work with quality assurance when she joined the Foundation Quality Assurance Committee in 2005. In 2015 Ms. Cooper-Piela took on the role of Medical Director for the Quality Assurance, Department of Foundation Medical Partners. In December of 2019 she was promoted to the role of Chief Quality Officer for Southern New Hampshire Health. She graduated from Boston College with a Bachelor's of Science in Nursing in 1991 and Master's in Nursing in 1994.

**Scott Cote, Vice President of Facilities and Emergency Management**
Mr. Cote joined the organization in 1999 as Director of Property Management, eventually assuming his current position. He is responsible for facility planning, operations, construction management and emergency management for Southern New Hampshire Health. Mr. Cote previously held positions as Director of Facility Operations for Dartmouth Hitchcock, the Nashua School District, and Merrimack College. He is a graduate of North Shore Technical School where he majored in construction theory and management. Mr. Cote attended New England Institute, majoring in mechanical engineering. He holds an unrestricted construction superintendent license and is a certified health care Emergency Professional.

**Sidi Cuko, Vice President, Clinical and Support Services**
Mr. Cuko began his healthcare career in Boston and first joined the organization in 2008. He assumed the position of Associate VP, Operations in 2017 and was promoted to his current position in 2019.  . Mr. Cuko holds a BA from the University of New Hampshire and MBA from Plymouth State University. He is board certified in health care management as a Fellow in the American College of Healthcare Executives and was

About Us

Our Mission and Vision >

Senior Leadership >

Code of Conduct >

Affiliations and Partnerships

Community Health

Nursing & Patient Care Services

Awards & Accreditations

Emergency Management

SNHH Blog

Simply Healthy Podcast

Our History

Exhibit 1

named a recipient of the '40 under 40' Award by the Nashua Telegraph in 2019 recognizing his contributions to drive change and business growth.

**Michael J DeLeo, MD, Chief Medical Officer, Foundation Medical Partners**
Dr. DeLeo is a board-certified diagnostic radiologist with subspecialty fellowship training in Breast and Oncologic Imaging. He received his B.A. from Middlebury College and his M.D. as a member of the Alpha Omega Alpha Honor Medical Society from the University of Massachusetts Medical School. Following his internship in Internal Medicine at Massachusetts General Hospital, Dr. DeLeo completed his residency in Diagnostic Radiology and Fellowship in Breast and Oncologic Imaging at the University of Pennsylvania, where he served as Chief Resident and completed a residency track in Healthcare Leadership and Quality. Since joining Southern New Hampshire Health in 2015, Dr. DeLeo has served on the Board of Governors of Foundation Medical Partners as the Radiology Division Chair, and Medical Executive Committee of SNHMC as the Radiology Department Chair. He is the Radiation Safety Officer for the Health System and Medical Director for the diNicola Breast Health Center and the SNHHS Cancer Program. Dr. DeLeo also serves as the Secretary/Treasurer of the New Hampshire state chapter of the American College of Radiology. He is a Certified Physician Executive through the American Association for Physician Leadership and is completing his Master's in Business Administration with a Focus in Medical Management at the Isenberg School of Management, University of Massachusetts.

**Cheryl Gagne, DNP, MBA, RN, CNE-BC, Vice President of Patient Care Services and Chief Nursing Officer**
Ms. Gagne joined the organization in 2000 first as Director of Nursing, then as Associate VP of Nursing until 2016 when she was promoted into her current role. Prior to her employment with the Medical Center, she held nursing management positions with several organizations, including Boston Medical Center, Manhattan Eye, Ear and Throat Hospital, and The Mount Sinai Medical Center in New York. Ms. Gagne is a graduate of Northeastern University with a BS in Nursing, and has earned an MBA in Health Care Administration from Baruch College/Mount Sinai School of Medicine. She completed her Doctorate in Nursing Practice at the University of New Hampshire in 2015.

**Joseph Leahy, DO, Associate Vice President of Emergency Medicine and Medical Director of Emergency Department**
Dr. Leahy joined Southern New Hampshire Medical Center in December 1997 as a staff emergency medicine physician and held several leadership positions prior to his appointment as Associate Vice President of Emergency Medicine. He has served as the Chief of the Medical Staff and Penultimate Past President of the NH Osteopathic Association. In addition to his administrative duties, Dr. Leahy continues to treat patients in the Emergency Department. Dr. Leahy graduated from the University Of New England College Of Osteopathic Medicine in Biddeford, ME, and completed a residency in Emergency Medicine at Union Hospital in Union, NJ.

**Timothy Scherer, MD, Chief Medical Officer for Southern New Hampshire Medical Center**
Dr. Scherer, a board-certified gastroenterologist, joined SNHH in 2018 as the Chief Medical Officer.  He received his B.S from the State University of New York, Binghamton, and his M.D. from The State University of New York Health Science Center, Brooklyn. He completed his Internship and Residency in Internal Medicine at Dartmouth Hitchcock Medical Center, Lebanon NH, and his Fellowship in Gastroenterology at Lahey Clinic, Burlington, MA. Dr. Scherer has served on Dartmouth-Hitchcock's Board of Trustees and the Board of Directors of the Surgery Center of Greater Nashua.

**Suzanne Tammaro, Vice President of Marketing**
Prior to joining the organization in 2014, Ms. Tammaro was Vice President and Senior Healthcare Strategist at KHJ Integrated (Boston).  She has held senior level marketing and communication positions with Caritas Christi Health Care (Boston) and Brockton Hospital.  Ms. Tammaro has extensive experience as a consultant to health care systems and provider organizations. She is a graduate of Boston University.

About Us

Our Mission and Vision >

Senior Leadership >

Code of Conduct >

Affiliations and Partnerships

Community Health

Nursing & Patient Care Services

Awards & Accreditations

Emergency Management

SNHH Blog

Simply Healthy Podcast

Our History

Exhibit 1

**Andrew Watt, MD, Vice President of Information Technology and Chief Information Officer**
Dr. Watt came to Southern New Hampshire Health System from Johns Hopkins Hospital where he completed his clinical training and was a member of their IT team. He has worked in a variety of technical and leadership positions. He worked for Meditech, Medical Information Systems, where he did software design, development, and implementation. Dr. Watt's main responsibility is to provide operational and strategic leadership for all the information technology and systems used at Southern New Hampshire Health. In addition, Dr. Watt maintains his clinical practice as an attending physician in the Emergency Department.

**Jacqueline Ferro-Woolley, Vice President of Human Resources**
Before joining Southern New Hampshire Health in February 2016, Mrs. Woolley served as Vice President of Human Resources, for St. Joseph Hospital, Nashua, New Hampshire. She holds a BS in Public Administration with a concentration in Management from Bentley College and a master's degree in Public Administration from Suffolk University, as well as SHPR; SHRM-SCP; and CCP certifications.

About Us

Our Mission and Vision >

Senior Leadership >

Code of Conduct >

Affiliations and Partnerships

Community Health

Nursing & Patient Care Services

Awards & Accreditations

Emergency Management

SNHH Blog

Simply Healthy Podcast

Our History

## Code of Conduct

Download and View the Code of Conduct.



Home | Language Assistance | Terms of Use | HIPAA | Sitemap | Employee Login

 

Exhibit 1



**Foundation**
southern new hampshire health
**Medical** Partners

268 Main Street | Nashua, NH 03060
P 603.577.2794  F 603.595.7662

September 30, 2016

Elizabeth Honigsberg, MD
3250 Fairfield Avenue, # 301
Bridgeport, CT 06605

Dear Elizabeth:

We enjoyed meeting with you and we are pleased to extend to you an offer to join Foundation Medical Partners and Southern New Hampshire Health. It is with overwhelming support from the medical leadership of this organization that I am extending this invitation. Should you wish to accept this offer, you will be joining Drs. Kenneth Howe, Luis Jimenez, Sanjay Gupta and Nicholas Tsaparlis in the practice known as Foundation Surgery.

1. **Term.** You will be offered a two (2) year contract with the ability to renew in incremental one year terms.   Your contract will begin on or before January 3, 2017.

2. **Salary.** Your initial salary will be two hundred and eighty hundred thousand dollars ($280,000). We will evaluate your salary annually and introduce a compensation formula which will allow you to earn increased salary in subsequent years.

3. **Moving Expenses.** Foundation Medical Partners will reimburse you for moving and relocation expenses up to $5,000 to include moving, temporary storage and other direct costs associated with relocating.

4. **Clinical Duties.** Your responsibilities will include thirty six (36) scheduled patient contact hours per week, except during authorized periods of absense, plus administrative and call responsibilities related to patient care.

5. **Benefits.** As further compensation for services rendered, your will receive:

- Professional liability insurance coverage with limits of one million dollars ($1,000,000) per claim and three million dollars ($3,000,000) annual aggregate.  The insurance is provided on a claims-made basis.  If you leave the employment of Foundation Medical Partners, the Foundation will purchase tail insurance providing you with continued protection for claims arising out of incidents during the time of your employment with Foundation Medical Partners;

- Paid earned time off of 223 hours per year (approximately 6 weeks) for the first 5 years; subsequently increasing to 259 hours per year (approximately 7 weeks) thereafter, and an additional 1 week time off each year for CME;

PLAINTIFF'S
EXHIBIT
B

Exhibit 1

Elizabeth Honigsberg, MD
September 30, 2016
Page 2 of 3

- A spending allowance according to our Professional Spending Allowance Policy annually for your professional development. Reimbursable expenses from the allowance include expenses for travel, lodging and meals, registration fees, continuing educational programs and meetings, annual membership dues to professional societies, and purchase of books and journals.

- The group's retirement benefits;

- Health insurance coverage, paid term life insurance, long-term disability insurance and other benefits offered by Foundation Medical Partners at the time of this agreement and as may thereafter be amended or modified;

- All other standard benefits which are outlined in Exhibit A.

This written offer is contingent upon securing New Hampshire licensure and privileges at Southern New Hampshire Medical Center.

We are excited about your interest in joining our team and feel this is an excellent opportunity for you and our medical community.  Should you have any questions, please feel free to call me at (603) 577-2114 or Leslie McGrath at (603) 281-8589.  Your response is respectfully requested by October 14, 2016.

If you are amendable to this offer please sign below indicating your interest.  Once signed, I will forward you an executable Employment Agreement and we can begin the "paperwork" process that lies ahead of us.

Sincerely,

Susan DeSocio
President/CEO
Foundation Medical Partners


Accepted: _____     Date: _____

Exhibit 1

Elizabeth Honigsberg, MD
September 30, 2016
Page 3 of 3

## EXHIBIT A
## BENEFITS FOR FULL TIME PHYSICIAN EMPLOYEES

| | |
|---|---|
| **Paid Time Off:** | The Physician shall receive 223.2 working hours of paid time off annually, which includes all holiday, sick, and vacation time. The Physician shall be eligible to take the paid time off as scheduled and approved by the Company. |
| **Health and Dental Insurance:** | Health Insurance will be provided through an insurance carrier selected by the Company and agreed to by the Physician. The Physician shall be responsible for a percentage of the monthly premium as determined by the Company consistent with co-payment obligations of other Company employees, and the insurance premium will be deducted from the Physician's salary payments. |
| **Life Insurance:** | Life Insurance for the Physician will be provided at two times the Physician's annual salary, not to exceed a maximum of $500,000. |
| **Short-Term Disability:** | Short-term disability insurance is available to the Physician, but must be paid by the Physician in bi-weekly installments which are payroll-deducted. |
| **Long-Term Disability:** | Long-term disability insurance in the amount of 60% of the Physician's salary up to a maximum of $10,000 per month. The Provider will not be eligible for the insurance until the defined waiting period of the insurance policy is satisfied. |
| **Deferred Compensation Plan:** | The Deferred Compensation Plan is a pre-tax savings plan available to the Physician for retirement savings purposes. |
| **457(b) Nonqualified Deferred Compensation Plan** | The Nonqualified Deferred Compensation plan is available to the physician as another avenue to save money on a pre-tax basis for retirement savings purposes. |
| **457 (f) Nonqualified Retirement Fund** | The Nonqualified Plan funded entirely by Foundation Medical Partners which provides supplemental retirement benefits. |

****_Benefits for Part Time Providers shall be determined in accordance with the Company's applicable Human Resources Policies._ ****

Exhibit 1



21 E. Hollis St., 3rd Floor
Nashua, NH 03060
P 603.577.2794
F 603.595.7662

October 19, 2016

Elizabeth Honigsberg, MD FACS
3250 Fairfield Avenue, #301
Bridgeport, CT 06605

Dear Elizabeth,

We are thrilled with your acceptance of the offer to join Foundation Medical Partners and Southern New Hampshire Health System. On behalf of Ken, Luis, Sanjay, Nick and the underline team, welcome! I've attached a proposed employment agreement for your consideration. The agreement reflects the terms agreed upon in your offer letter executed October 8, 2016 with an adjustment in your start date to "on or about January 30". Please let me know if that is acceptable for contract language. We will need to finalize a start date for purposes of malpractice coverage, insurance enrollment and patient scheduling sometime in the coming weeks. Should you have any questions or concerns please do not hesitate to contact me.

If you are amenable to the agreement as proposed, please sign the agreement and return to my attention. I will then sign on behalf of Foundation Medical Partners and send back to you a fully executed copy of the agreement. Then we are on our way!

I look forward to working with you.

Sincerely,

Sue DeSocio
President/CEO

Cc: Leslie McGrath (letter only)

Exhibit 1

# PHYSICIAN SERVICES AGREEMENT

**AGREEMENT**, made as of this _25th_ day of _November_ 2016 by and between Foundation Medical Partners, Inc. a non-profit corporation with a business address of 8 Prospect Street, Nashua, New Hampshire 03061 (the "Company"), an affiliate of Southern New Hampshire Health System, and Elizabeth Honigsberg, MD (the "Physician").

## WITNESSETH THAT:

WHEREAS, a physician specializing in general surgery is needed to serve the Greater Nashua and area (the "Service Area);

WHEREAS, the Company has been organized for the purpose of promoting the lawful interests of Southern New Hampshire Medical Center (the "Medical Center"), by coordinating the delivery of health care;

WHEREAS, the Company desires to engage a highly qualified physician specializing in general surgery to provide services to patients of the Company and the Medical Center;

WHEREAS, by engaging the Physician in the full-time practice of general, the Company can better ensure that the needs of patients in the greater Nashua area will be satisfied; and

WHEREAS, the Physician is willing and desirous to be so engaged under mutually satisfactory terms and conditions.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained and other good and valuable consideration, the receipt of which is hereby acknowledged, the Company and the Physician agree as follows:



**PLAINTIFF'S EXHIBIT**

**C**

Exhibit 1

1.      Terms.  The Term of this Agreement shall commence on or before March 1, 2017 and shall, unless terminated as provided herein, continue for a period of two years (the "Initial Term").  Thereafter, this Agreement shall be automatically renewed for successive one (1) year terms (each referred to as a "Renewal Term"), unless terminated as provided herein.  The word "term" as used in this Agreement without any modifier shall mean the Initial Term and any Renewal Terms.

2.      Compensation and Benefits.

2.1     Compensation and Benefits.  The Company shall pay the Physician an initial base compensation for any and all services provided hereunder of $280,000 per annum, payable in biweekly installments of approximately $10,769 (minus standard payroll withholding and other applicable deductions). The Company shall evaluate Physician's base compensation annually and, based upon the Physician's performance and such other factors as market rates, quality, productivity and patient satisfaction, may modify said base compensation for subsequent years.

In accordance with the Internal Revenue Service's standards for tax-exempt organizations, the Physician's compensation is subject to the limitation that total compensation paid to the Physician shall not exceed reasonable compensation.

The Physician shall be entitled to receive the standard fringe benefits received by similarly situated Company employees, which benefits may be modified from time to time.   The Company's current fringe benefits for similarly situated employees are set forth in Exhibit A.

In accordance with Section 2.2, below, the Company shall also pay the Physician's malpractice insurance coverage.

2.2     Insurance.  At all times during the Term of this Agreement, the Company shall provide for the Physician, through a duly licensed insurance company, professional liability insurance coverage on a "claims made" basis with limits of at least One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate, or such other minimum limits as may be required by the Company from time to time.  Upon termination of this Agreement for any reason by either party,

Exhibit 1

the Company further agrees to purchase tail insurance coverage insuring the Physician against any claims occurring during the period that the Physician is providing services to the Company.

2.3   <u>Continuing Medical Education.</u>  The Physician shall be entitled to receive one week per year of paid time to pursue continuing medical education (reduced proportionately for any period of less than one (1) year that this Agreement remains in effect).  The Physician's reasonable and documented expenses relating to the pursuit of said continuing medical education shall be reimbursed consistent with the Company's Professional Spending Allowance Policy (current policy attached in Exhibit B).

2.4   <u>Moving Expense.</u> In consideration of the Physician moving her residence to the greater Nashua area, the Company shall pay all reasonable costs associated with moving the Physician to the area up to $5,000. Reimbursable expenses shall include moving, temporary storage and other direct costs associated with relocating Physician and her family within closer proximity to Nashua.

3.   <u>Obligations of the Physician</u>.

3.1   <u>Clinical Duties</u>.  The Physician shall provide full-time services in the specialty of general surgery to the patients of the Company. Responsibilities include a minimum of thirty-six (36) scheduled patient contact hours per week including office, operating room and hospital rounding, plus administrative responsibilities relating to patient care (i.e. charting and patient call backs). In addition, the Physician shall participate in on-call and coverage arrangements in accordance with the Company's policies as amended from time to time.

3.2.   <u>Educational Programs</u>.  The Physician shall participate in educational programs as mutually agreed upon by the Company and the Physician.

3.3   <u>Practice Obligations</u>.  The Physician shall devote her full time and best efforts to the performance of her obligations under this Agreement as an employee of the Company.  During the terms of this Agreement, the Physician shall not engage in the practice of medicine except as provided in this Agreement, and shall not establish or

Exhibit 1

maintain an office for the practice of medicine at a site other than that designated by the Company without the prior written consent of the Company.

      3.4   <u>License and Medical Staff Membership and Privileges and Drug Prescribing Authority</u>.

      (a)   <u>License, Medical Staff Membership and Privileges and Drug Prescribing Authority</u>.  The Physician acknowledges that this Agreement is expressly contingent upon the Physician obtaining and maintaining (a) full and unrestricted license to practice medicine in New Hampshire; (b) full and unrestricted Medical Staff membership and clinical privileges at the Medical Center; (c) state and federal drug prescribing authority and certificates (including authority to prescribe narcotic drugs and controlled substances); and (d) legal authorization to work in the United States.  The Physician agrees to maintain such license to practice medicine and such Medical Staff membership and clinical privileges, and such drug prescribing authority, and such legal authorization to work in the United States without limitation, restriction or sanction, throughout the term of this Agreement.  The Physician shall provide to the Company written notice within fifteen (15) days of her receipt of notification of the initiation of any proceeding by a licensure board, regulatory authority or health care facility which may affect the Physician's license, medical staff membership or privileges, the Physician's drug prescribing authority in any jurisdiction or facility, or the Physician's ability to legally work in the United States.

      (b)   <u>Effect of Proceeding Affecting License, Medical Staff Membership/ Privileges or Drug Prescribing Authority</u>.  Should the Physician cease to be an Active Member, as defined in the Medical Staff By-laws of the Medical Center, of the Medical Center's Medical Staff for any reason, or should the Physician's clinical privileges at the Medical Center be suspended, restricted or relinquished, or should the Physician's license to practice medicine in the State of New Hampshire or state or federal drug prescribing authority be revoked, suspended, relinquished or otherwise subjected to disciplinary action, or should the Physician not obtain or subsequently lose legal authorization to work in the United States, this Agreement shall automatically terminate effective as of the date of such cessation of Active Staff membership, suspension, restriction or relinquishment of Medical Center privileges, or relinquishment, revocation, suspension or other discipline involving Physician's license,

Exhibit 1

Elizabeth Honigsberg, MD FACS
Contract
Page 5

or loss of legal status to work in the United States, whichever date is earlier.  Upon such action, any and all rights to further payments under this Agreement shall terminate without further notice or action being required by the Company, provided, however, that the Company shall pay to the Physician any base compensation which accrued to the Physician on or before the date of termination.

(c)    Compliance with Medical Staff By-Laws and Policy.    The Physician shall abide at all times by the Bylaws, Rules and Regulations, and Policies and Procedures of the Medical Center, the Medical Center Medical Staff and the Company, as amended from time to time, and shall at all times act in a professional manner as determined by applicable standards of good medical and hospital practice.

3.5    Standard of Care.    The Physician will perform all obligations hereunder cooperatively and efficiently and in conformity with all applicable prevailing standards of good medical and hospital practice in the greater Nashua, New Hampshire area, as such standards may be revised from time to time, including but not limited to all applicable requirements set forth in the statutes and regulations of the State of New Hampshire; regulations of the United States Department of Health and Human Services; the requirements of all third-party payers; the Medical Center's Medical Staff bylaws and Medical Staff Rules and Regulations; and the policies and procedures established by the Medical Center and/or the Company.

3.6    Medical Records.    The Physician agrees to make prompt and full entries on medical records including the entire medical portions of such records within the time periods prescribed by the Company.  Such records shall remain the property of the Company and shall be maintained in the customary manner and in compliance with all applicable laws and standards pertaining to the maintenance and confidentiality of medical records.

3.7    Reassignment.    During the term of this Agreement, the Physician hereby assigns and grants to the Company the right to bill and collect for all professional services rendered by her under this Agreement and all accounts receivable and the proceeds thereof arising out of such services.    Upon the termination of this Agreement for any reason whatsoever, all such accounts receivable then outstanding shall be the sole and exclusive property of the Company and not subject to any claim by the Physician.

Exhibit 1

*Elizabeth Honigsberg, MD FACS*
*Contract*
*Page 6*

3.8    Participation in Health Plans.  The Physician agrees to participate in Medicare, Medicaid, and in such other health insurance plans as requested by the Company and to comply with all administrative requirements of such plans.

3.9    Practice of Medicine.  The Physician shall be responsible for the conduct of the practice of medicine, and shall be responsible for the quality of care rendered by her and by other professional staff working under her supervision.  The Company shall exercise no control over the practice of medicine by the Physician.

3.10   Government Access to Books and Records.   In accordance with Section 952 of the Omnibus Reconciliation Act of 1982, the Physician agrees that the Comptroller General of the United States, the United States Department of Health and Human Services, and their duly authorized representatives shall be allowed access to the Physician's contracts, books, documents and records to the extent necessary to verify the nature and extent of the costs of the services rendered by the Physician pursuant to this Agreement.  The Physician hereby agrees to maintain such contracts, books, documents and records until the expiration of four years after the services to which they relate have been furnished under this Agreement.

3.11   No Authority to Bind.    The Physician acknowledges that the Physician shall have no authority to bind the Company to contracts, leases, or agreements; or to purchase equipment, supplies, or services for or on behalf of the Company.

4.    Obligations of the Company.

4.1    Right to Bill and Set Charges.  The Company shall make best efforts to bill and collect from all patients and third party payors for all professional services rendered by the Physician under this Agreement.  The Physician shall not bill any patient or third party payor for any professional service rendered by her hereunder.

4.2    Facilities.  The Company shall make available to the Physician suitable space, facilities, equipment, supplies, support staff, technical staff, and answering and paging services in order that she may perform her duties under this Agreement.

Exhibit 1

5.      Termination.

[a]      The Company may at any time immediately terminate this Agreement for any of the following reasons:

1.      Provision of false, misleading, inaccurate or incomplete information by Physician in any document relating to the Physician's application for employment or application for credentialing or privileges;

2.      Failure to report any changes in information submitted in connection with Physician's applications for employment, credentialing or privileges;

3.      Physician's prescribing or administering medications in violation of DEA laws or regulations;

4.      Physician's use of drugs or alcohol to an extent or in a manner that renders the Physician an impaired professional or adversely affects the Physician's performance of the Physician's obligations under this Agreement (This provision shall be applied as is consistent with the Americans With Disabilities Act and the Southern New Hampshire Medical Center's Medical Staff's Professionals Health Committee Policies);

5.      Physician's arrest and/or indictment for a felony or of any crime involving moral turpitude, fraud or misrepresentation;

6.      Willful conduct of the Physician resulting in substantial loss to the Company, substantial damage to the Company's reputation, or theft from the Company;

7.      Failure of the Physician to meet the requirements of Section 3.4 of this Agreement.

8.      Physician's revocation of the assignment set forth in Section 3 .7.

9.      Failure of the Physician to meet the standard of care as set forth in Section 3.5 of this Agreement; and

Exhibit 1

10.     Failure to abide by the corporate compliance programs of the Company.

[b]     Either party may terminate this Agreement at any time for breach of any terms of this Agreement, upon thirty (30) days prior written notice specifying therein the alleged breach, provided that no breach shall be deemed to have occurred for the listed reasons if the breaching party has cured said breach prior to the expiration of the notice period.  For purposes of this Agreement, the following actions or omissions, among others, by the Physician shall be deemed to constitute a breach of this Agreement, provided that the following list shall not be deemed to be a comprehensive list of all acts or omissions constituting a breach:

1.     Failure to abide by the policies and procedures of the Company or the Medical Center' Medical Staff;

2.     Failure to cooperate actively and constructively in achieving the Company's business objectives as directed by the Company,

3.     Failure to conduct herself in a professional manner or cooperate with patients, office staff, colleagues and staff of the Company; or

4.     Failure to correct recurring issues or problems (including productivity and financial issues) identified to the Physician by the Company as discerned by the Company through patient complaints, internal productivity monitoring, financial reports or any other manner of performance monitoring.

[c]     Following the Initial Term of this Agreement, this Agreement may be terminated without cause by either party giving the other at least one-hundred and eighty (180) days prior written notice.  In the event that either party gives such notice, the Company shall have the option to pay all salary through the date one-hundred and eighty (180) days hence, and terminate the employment prior to the date one hundred and eighty (180) days hence.

Exhibit 1

6.     Confidentiality.

(a)   The Physician agrees should this Agreement be terminated for any reason she will not take with her or retain, without written authorization from the Company, any papers, patient lists or records, files or other documents or copies thereof or other information of any kind belonging to the Company or Medical Center pertaining to the business or financial condition of the Company or Medical Center.

The Company and its affiliates and the Physician agree that the foregoing papers, patient lists, records, files, documents and information will be treated as information that is confidential and proprietary to the Physician and the Company. Unauthorized disclosure of such information by the disclosing party may cause irreparable harm to the other party.  Therefore, the Physician and the Company agree not to disclose such information to any third party without the prior consent of the other party, except to the parties' counsel, accountant, business advisors on a "need to know basis" or as may be required by governmental filings or requests.

7.     Notices.  Notices pertaining to this Agreement shall be sent by registered or certified mail, postage prepaid, return receipt requested at the following addresses:

To the Company:     Susan DeSocio, CEO
Foundation Medical Partners
10 Prospect Street
Nashua, NH  03061

To the Physician:     Elizabeth Honigsberg, MD
3250 Fairfield Avenue, #301
Bridgeport, CT 06605

8.     Regulatory Changes.  In the event that federal or state laws or regulations governing payment to the Company for services covered by this Agreement undergo change during the term hereof such that the Company is not reimbursed for services provided hereunder for which it is making payment, the Physician shall upon written notice of the Company negotiate in good faith with respect to an appropriate amendment of this Agreement such that the Company is required to make payment for, or to provide, only those services for which it is reimbursed.  If the parties hereto are unable to reach agreement regarding such amendment, the Company or the Physician

Exhibit 1

*Elizabeth Honigsberg, MD FACS*
*Contract*
*Page 10*

shall have the right to terminate this Agreement upon thirty(30) days' prior written notice.

9.    Entire Agreement.    This Agreement represents the entire agreement between the parties concerning the subject matter hereof.

10.    Amendment.    No modification, extension or alteration of this Agreement shall be legally binding upon either party unless in writing and executed by the parties hereto.

11.    Miscellaneous.    This Agreement may not be assigned by either party without the written consent of the other party hereto, and shall be binding in all its parts upon the parties hereunder and upon their successors.  The waiver by either party of any breach by the other party of any provision of this Agreement shall not operate as a waiver of any subsequent breach.  This Agreement shall be governed by the laws of the State of New Hampshire.  Any conflict between the provisions of this Agreement and the laws or regulations of the State of New Hampshire or the United States of America shall render the affected provisions herein null and void as a result thereof.  Should any part of this Agreement for any reason be declared invalid, such decision shall not affect the validity of any remaining portion which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated.

12.    Survival.  The provisions of Sections 2.2, 3.6, 3.7, 3.9, 3.10, 3.11, 6, 7, 9, 10 and 11 shall survive any termination or expiration of this Agreement.

Exhibit 1

*Elizabeth Honigsberg, MD FACS*
*Contract*
*Page 11*

IN WITNESS WHEREOF, the Company, by its duly authorized officer in accordance with her vested authority, and the Physician have caused this Agreement to be executed as of the date first above noted.

Foundation Medical Partners

Date: 11/28/16

By: _____
    Susan DeSocio, President/CEO

By: _____
    Witness

Date: 11/25/2016

By: _____
    Elizabeth Honigsberg, MD

By: _____
    Witness

Exhibit 1

## EXHIBIT A
## BENEFITS FOR FULL TIME PROVIDERS

| | |
|---|---|
| **Paid Time Off:** | The Physician shall receive 223.2 working hours of paid time off annually, which includes all holiday, sick, and vacation time.  The Physician shall be eligible to take the paid time off as scheduled and approved by the Company. |
| **Health and Dental Insurance:** | Health Insurance will be provided through an insurance carrier selected by the Company and agreed to by the Physician.  The Physician shall be responsible for a percentage of the monthly premium as determined by the Company consistent with co-payment obligations of other Company employees, and the insurance premium will be deducted from the Physician's salary payments. |
| **Life Insurance:** | Life Insurance for the Physician will be provided at two times the Physician's annual salary, not to exceed a maximum of $500,000. |
| **Short-Term Disability:** | Short-term disability insurance is available to the Physician, but must be paid by the Physician in bi-weekly installments which are payroll-deducted. |
| **Long-Term Disability:** | Long-term disability insurance in the amount of 60% of the Physician's salary up to a maximum of $10,000 per month. The Provider will not be eligible for the insurance until the defined waiting period of the insurance policy is satisfied. |
| **Deferred Compensation Plan:** | The Deferred Compensation Plan is a pre-tax savings plan available to the Physician for retirement savings purposes. |
| **457(b) Nonqualified Deferred Compensation Plan** | The Nonqualified Deferred Compensation plan is available to the physician as another avenue to save money on a pre-tax basis for retirement savings purposes. |
| **457 (f) Nonqualified Retirement Fund** | The Nonqualified Plan funded entirely by Foundation Medical Partners which provides supplemental retirement benefits. |

*Benefits for Part Time Providers shall be determined in accordance with the Companys applicable Human Resources Policies.*

FMP/Contract Physicians Exhibit A

Exhibit 1

**EXHIBIT B**
**FOUNDATION MEDICAL PARTNERS**
**POLICY**

**POLICY NAME:**   Professional Spending Allowance

**POLICY PURPOSE:** To establish guidelines for the use, recording and reimbursement of professional expenses.

**SCOPE:**
Applies to all Providers

**COMPLIANCE AND REVIEW:**
All Providers, Division Chairs, Medical Director, Directors and Managers are responsible for the proper administration of this policy.

**POLICY:**
Foundation Medical Partners (FMP) provides an amount of money each fiscal year to Providers to pay for professional expenses that support or enhance the clinical practice.

**PROFESSIONAL SPENDING ALLOWANCE: BENEFIT AMOUNTS**

| | |
|---|---|
| Physician, single Board Certification | $ 3,200 |
| Physician, double Board Certification * | $ 4,000 |
| Physician, 3 or more Board Certifications | $ 5,000 |
| Nurse Practitioner/PA single Certification | $ 2,100 |
| Nurse Practitioner/PA multi Certification | $ 3,000 |
| Behavioral Health Allied Health Providers | $   500 |

- The Professional Spending Allowance will be prorated for Providers who are less than .80 FTE.
- The Professional Spending Allowance will be prorated for providers who are employed less than one (1) year.
- The Board of Trustees of FMP will determine the benefit amount of Professional Spending Allowance for each fiscal year.
- Physicians who have had a minimum of 6 months additional formal training in a subspecialty and at least 20% of their clinical revenues are attributed to this subspecialty will fall under the double Board Certification level of professional allowance benefit.
- A provider may elect, at the end of a fiscal year, to carryover any unused portion of their professional spending allowance into the next fiscal year. This balance cannot exceed two (2) times the provider's professional spending allowance.

**PROFESSIONAL SPENDING ALLOWANCE: ELIGIBLE EXPENSES**
- Professional books, subscriptions to journals and periodicals

Exhibit 1

- Registration fees for programs which enhance professional training and education
- Reasonable travel and meal expenses related to continuing education activities (Family members, companion expenses and alcohol are not reimbursable.)
- Other clinical or educational related expenses

## PRACTICE BUDGET: ELIGIBLE EXPENSES

The following professional related expenses would be subject to budget approval and paid out of the practice budget.
- PHO dues
- Medical Staff dues
- Licenses
- Test fees for Board Certification and Board Re-Certification
- Special training for new clinical programs within the practice
- Professional Membership Fees (limited to one professional membership per year)

## PROCEDURE:

- If a Provider intends to seek reimbursement through the Professional Spending Allowance the Division Chair should approve the educational program prior to registration
- All requests for reimbursement must be submitted within 90 days of the time the expense was incurred.
- The Provider must complete the Reimbursement Form, attaching invoices and evidence of expenditures
- The CME Reimbursement Form will be given to the Manager. The Manager will code the CME Reimbursement Form.
- Managers, in consultation with Division Director/Division Chair, process all requests for reimbursement of expenses.
- The Division Director will review all reimbursed expenses to ensure compliance with this policy.
- A Check Request Form, with itemized receipts attached, will be forwarded to the Accounts Payable Department for payment.
- The Manager will maintain records of all expenditures on the CME Tracking Form. These records are available for provider review.

Exhibit 1

**From:** Honigsberg, Elizabeth
**Sent:** Thursday, March 07, 2019 7:48 PM
**To:** Scherer, Timothy
**Cc:** Smith, Tammy; Dorf, Robert
**Subject:** Re: Patient Complaint

I am so happy it helped the situation - even difficult patients deserve time and consideration.  It also made it easier that you were there Tammy!

Very best regards,
Elizabeth
Sent from my iPhone

> On Mar 7, 2019, at 5:50 PM, Scherer, Timothy <Timothy.Scherer@snhhs.org> wrote:
>
> Well done!!!  Thank you for your compassion!
> Tim
>
> Sent from my iPhone
>
> On Mar 7, 2019, at 5:44 PM, Smith, Tammy <Tammy.Smith@snhhs.org> wrote:
>
> Dear Dr. Honigsberg,
> I wanted to thank you for taking the time tonight to meet with the patient on 4E.  The patient and mother were very frustrated with the lack of communication during their interactions with SNHMC for the past week.  You walked in at the perfect moment and totally changed their experience.  You taking the time to listen to their concerns, answer their questions and go through her medical record with them was wonderful.  This interaction completely changed their experience and showed how much you care on behalf of the Medical Center.  Thank you for all you do and I hope you feel better
> Tammy
>
> Tammy Smith
> *Patient Relations Administrator*
> *Administration*
>
> Southern New Hampshire Medical Center
> 8 Prospect Street I Nashua, NH 03060
> p 603-281-6822 I f 603-577-2772



PLAINTIFF'S
EXHIBIT
Exhibit 1

ə tammy.smith@snhhs.org| snhhealth.org

&lt;image002.jpg&gt;

In accordance with NH RSA 151:13-a and 329:29-a, this Quality Assurance document shall be CONFIDENTIAL AND PRIVILEGED

Exhibit 1

**From:** "Honigsberg, Elizabeth" <Elizabeth.Honigsberg@snhhs.org>
**Date:** March 22, 2019 at 5:23:37 PM EDT
**To:** "Dorf, Robert" <Robert.Dorf@snhhs.org>
**Subject: Re: Touch Base - Dr. Honigsberg / Dr. Dorf**

Ok.  I will certainly tell you what's going on…it's a lot though just to be frank with you and Tim has been very kind and supportive.

I will see you Monday.  Have a nice weekend.

Sent from my iPhone

On Mar 22, 2019, at 5:20 PM, Dorf, Robert <Robert.Dorf@snhhs.org> wrote:

It's okay. We can do it end of day. As for why, I've been hearing some things and am aware of conversations you have had with Tim Scherer. I wanted to check in on you and see where things were at.

Rob

Sent from my iPhone

On Mar 22, 2019, at 1:59 PM, Honigsberg, Elizabeth <Elizabeth.Honigsberg@snhhs.org> wrote:

I do not mean to be difficult but I cannot rearrange my childcare at this point. Things are changing for me Rob and I haven't quite figured out how this is



Exhibit 1

all going to work out as of yet. I will accommodate your schedule to the best of my ability.

Also, could you please tell me what this is about? I already can sense something is wrong and I honesty will be sick over this all weekend.

Elizabeth

Sent from my iPhone

On Mar 22, 2019, at 1:23 PM, Dorf, Robert <**Robert.Dorf@snhhs.org**> wrote:

Its kinda important and hopefully only once.

Rob

From: Honigsberg, Elizabeth
Sent: Friday, March 22, 2019 1:08 PM
To: Dorf, Robert
Subject: Re: Touch Base - Dr. Honigsberg - Dr. Dorf

Hello Dr. Dorf

How are you? I am starting to spend more time with my twins so MW F I drive them to school and start my office at 9. Is there any other day or a later time we can meet?

All the best,
Elizabeth

Sent from my iPhone

On Mar 21, 2019, at 2:23 PM, Dorf, Robert <**Robert.Dorf@snhhs.org**> wrote

Exhibit 1



21 E. Hollis St., 3rd Floor
Nashua, NH 03060
P 603.577.2794
F 603.595.7662

November 12, 2019

Elizabeth Honigsberg, MD
34 Franklin Street, Apt. 335
Nashua, NH  03064

**Re:**    **ADA Certification Form Dated 10/31/19**

Dear Dr. Honigsberg,

This letter is in response to your Americans With Disabilities Act (ADA) Certification Form dated October 31, 2019 (Form) where you have requested an additional 4-6 week leave from work, as you are unable to perform "solo surgery, operating independently, overnight call and ASC."  This leave request of an additional 4-6 weeks is granted.

However, your Form also seeks an accommodation to perform the essential functions of your job. Specifically, in order to perform your job, you have requested to double scrub until you feel comfortable to return to independent surgery.  After reviewing your accommodation request and reviewing the surgical team's capacity, we are not able to accommodate your request to double scrub.  To require the surgical team to double scrub with you would be an undue hardship.  Your absence has resulted in less surgical resources and, in order to safely care for patients, we have no capacity to accommodate double scrubbing.  The ability for our surgeons to operate independently is a critical component of our ability to provide timely and safe surgical care.

At this point, while we have granted your request for an additional 4-6 weeks of leave, we cannot commit to allowing you leave beyond this request.  We will continue to engage in discussions with you and we expect you to do the same.  As a reminder, please refrain from visiting the surgical suite during your leave.  If you need assistance outside of Human Resources while you are on leave, please contact me directly.

Sincerely,

Robert Dorf, DO
President



PLAINTIFF'S
EXHIBIT
F
Exhibit 1

# DL&G   DOUGLAS, LEONARD & GARVEY, P.C.

## ATTORNEYS

Charles G. Douglas, III*
C. Kevin Leonard
Carolyn S. Garvey
Benjamin T. King**
Megan E. Douglass
Jared J. Bedrick
Samantha J. Heuring

14 SOUTH STREET, SUITE 5
CONCORD, NEW HAMPSHIRE 03301

Telephone:  603-224-1988
Facsimile:  603-229-1988
Email:  mail@nhlawoffice.com
www.nhlawoffice.com

\*   also admitted in MA
\*\* also admitted in ME

Monday, December 9, 2019

**VIA EMAIL & CERTIFIED MAIL TO FOLLOW**
Dr. Robert Dorf, President
Foundation Medical Partners
21 East Hollis Street, 3rd Floor
Nashua, NH 03060
Robert.Dorf@snhhs.org

      RE:    **Dr. Honigsberg's Request for ADA Accommodation**

Dear Dr. Dorf:

      Dr. Elizabeth Honigsberg has retained me to help her navigate the process of obtaining a reasonable accommodation under the Americans with Disabilities Act (ADA)[1] for her disability, acute post-traumatic stress disorder (PTSD). Accordingly, please find Dr. Honigsberg's request for accommodation below.

      Dr. Honigsberg is eager to return to surgical practice, and she understands that additional discussion of her accommodation request may be needed. I look forward to those discussions, and I will do my part to expedite them so that Dr. Honigsberg's return to work date need not be postponed due to an extended interactive process.[2] By our calculation, Dr. Honigsberg's return will be Monday, December 16, 2019 as her leave will expire on Friday, December 13. **As such, please contact me regarding the approval of Dr. Honigsberg's accommodation by end of day Tuesday, December 10.** My telephone and fax is above, or you can email me at samantha@nhlawoffice.com.

---

[1] 42 U.S.C. § 12101 et seq., as amended.

[2] "Interactive process" is a term of art used to describe the ADA's requirement that the employer engage in discussions with the employee about what accommodation is appropriate. See 29 C.F.R. § 1630.2 (o)(3).



PLAINTIFF'S
EXHIBIT
G
Exhibit 1

I.    **Dr. Honigsberg makes the following request for reasonable accommodation.**

Your November 12th letter to Dr. Honigsberg referenced the ADA Certification Form (dated October 31st) completed by Dr. Honigsberg's treating therapist, Dr. Michelle Ronayne. To date, Dr. Honigsberg continues to treat with Dr. Ronayne for her PTSD. With the passage of time and continued assessment of Dr. Honigsberg's disability and capabilities, it is Dr. Ronayne's professional opinion that the accommodation requested within the earlier ADA Form is no longer necessary.

At Dr. Honigsberg's November 26th appointment, Dr. Ronayne evaluated Dr. Honigsberg's medical progress, and the two discussed her disability in the context of the essential functions of her general surgeon position. Based on Dr. Honigsberg's progress, her disability's current limitations, and her position's essential functions, Dr. Ronayne endorsed the reasonable accommodation requested by Dr. Honigsberg herein. See attached hereto the accommodation request signed by Dr. Ronayne.

To summarize the attached request, Dr. Honigsberg is requesting the reasonable accommodation of double scrubbing only for the most challenging and complex intra-abdominal cases, i.e., perforated viscus, perforated colon, acute cholecystitis, and other similarly challenging or complex procedures. This accommodation is not requested for an indefinite period, but would only be necessary while Dr. Honigsberg re-acclimates to the operating room and to performing difficult procedures.

This accommodation request is directly linked to Dr. Honigsberg's disability. Where PTSD limits brain function by causing a decrease in self-confidence, this accommodation will enable Dr. Honigsberg to confidently perform these complex and difficult procedures and will ensure that a lack of confidence, if any should exist, will not interfere with Dr. Honigsberg's performance of her position's essential functions.

a.    **Dr. Honigsberg's accommodation request is reasonable.**

First, Dr. Honigsberg's request is reasonable because it is narrow in scope because it pertains only to the most difficult procedures required by her position. Notably, an employer's duty to reasonably accommodate includes "job restructuring."[3] Here, however, Dr. Honigsberg is not requesting job restructuring, but simply that she be proctored by another surgeon while she continues to perform her position in its existing structure and only the most difficult tasks required therein.

Second, Dr. Honigsberg's request is reasonable because it is required only for a limited duration of time. Based on Dr. Honigsberg's previous medical experience and Dr. Ronayne's evaluation of her condition by, Dr. Honigsberg and Dr. Ronayne expect

---

[3] 42 U.S.C.A § 12111(9)(B).

Exhibit 1

that she will re-acclimate to the operating room and to performing difficult procedures in a very brief period. Here, the experience of Dr. Jo Buyske, Executive Director of the American Board of Surgery (ABS), is informative. Dr. Buyske, like Dr. Honigsberg, was absent from active surgical practice for an extended period. Regarding her return to practice, Dr. Buyske stated that "after several days in the OR, I was back in the groove."[4] Dr. Buyske's experience is instructive in so far as "reasonable accommodation" in the practice of surgery, where she was absent from her practice for a full two years, as opposed to Dr. Honigsberg's six month absence, and Dr. Buyske was accommodated so as to complete a formal re-entry program, as opposed to Dr. Honigsberg's comparatively, yet reasonably, under the circumstances, lesser request for informal double scrubbing on difficult cases.

Third, Dr. Honigsberg's request is reasonable because it is modeled after generally accepted standards of professional surgical practice. In fact, the ABS Guidelines for surgeons re-entering active surgical practice endorse a "proctoring plan."[5] Where Dr. Honigsberg has been absent for six months, proctoring her on a limited basis to ensure that her surgical skills are intact is essential, and her accommodation request for limited double scrubbing would do that. In light of the foregoing, Dr. Honigsberg's limited request to double scrub for difficult cases is reasonable.

### b. Dr. Honigsberg's accommodation request is feasible under the circumstances and would not impose an undue hardship.

An employer is liable for failure to reasonably accommodate the known limitations of an otherwise qualified employee[6] unless the employer can show the accommodation is an "undue hardship" by "requiring significant difficulty or expense."[7] Here, where Dr. Honigsberg's request for reasonable accommodation is feasible under the circumstances and does not require significant difficulty or expense, that request must be granted.

Dr. Honigsberg is not aware of any change in surgical resources except that resources have increased by the addition of three physician assistants (PA's). Thus, in addition to Dr. Honigsberg, existing surgical resources upon her return include four general surgeons, two general surgery PA's, one colorectal surgeon and one colorectal PA. As you are likely aware, it was previously proposed that Dr. Honigsberg double

---

[4] General Surgery News, *Physician Re-Entry: Managing the Bumpy Road*, generalsurgerynews.com, available at https://www.generalsurgerynews.com/In-the-News/Article/10-18/Physician-Re-Entry-Managing-the-Bumpy-Road/53010?sub=6CB4505D3F4E7434F342E8CEDDD36EA48483E49B459AF2 0B8C3C8A9101426 (last visited Dec. 6, 2019).
[5] The American Board of Surgery, *Guidelines on Re-entry to Surgical Practice*, abssurgery.org, available at http://www.absurgery.org/default.jsp?policypracticereentry (last visited Dec. 5, 2019).
[6] 42 U.S.C.A § 12112(b)(5)(A).
[7] 42 U.S.C.A § 12111(10)(A).

Exhibit 1

scrub to aid Dr. Flannery with difficult cases during the start of his solo practice, sufficient surgical resources existed at that time, which was before the addition of three PA's, such that double scrubbing two surgeons was feasible. Moreover, Dr. Honigsberg has previously double scrubbed with Dr. Jiminez on numerous occasions. Both when Dr. Honigsberg double scrubbed with Dr. Jiminez and when it was proposed that she double scrub with Dr. Flannery, there was never any indication that double scrubbing did or would result in "undue hardship."

Where the foregoing resources exist, and where elective practice surgeons often do not have enough elective surgeries to perform, it is clear that Dr. Honigsberg's requested accommodation is feasible. Further, where the factors[8] delineated by the ADA, factors which would deem an accommodation unduly burdensome if met, are unmet here, it is clear that Dr. Honigsberg's requested accommodation does not meet the ADA's definition of "undue hardship."[9]

**II.   Because Dr. Honigsberg is committed to the surgical department's success, supporting her fellow surgeons and providing patients quality care, she wants to help ease the period of her re-entry and therefore proposes the following.**

Dr. Honigsberg is prepared to take on a call schedule commensurate with what she has missed. To do so, she is even willing to become the "surgical nocturnist" to relieve the rigors of the call schedule. Dr. Honigsberg is also willing to fulfill less appealing roles by taking on greater involvement in the Wound and Obesity Clinics. She also hopes to regain her role as Surgical Clerkship Director over time.

**III.   Conclusion**

In closing, Dr. Buyske's words feel fitting: "surgeons have invested a huge amount of time and energy in their training, and to slam the door behind them because of an illness or family obligations is crazy... that is why physicians who want to come back should have a pathway readily available to them."[10] I am sure you would agree, and I look forward to discussing Dr. Honigsberg's return to work with you.

Sincerely,

*Samantha Heuring*

Samantha J. Heuring, Esq.

Enclosures
CC:   Dr. Elizabeth Honigsberg

---

[8] 42 U.S.C.A § 12111(10)(B)(i) to (iv).
[9] 42 U.S.C.A § 12111(10)(A).
[10] General Surgery News, *Physician Re-Entry: Managing the Bumpy Road*, supra.

Exhibit 1

December 2, 2019

Dear Dr. Dorf,

I am writing regarding my request to double scrub before returning to all the essential functions of my job. The American Board of Surgery established guidelines in 2012 regarding Re-entry to Surgical Practice. Now, these guideline pertain to Surgeons who have been out of practice for two or more years; thankfully my absence has only been approximately 6 months. However, the proctoring of Surgeons to ensure their surgical skills are intact is essential to safely car- ing for patients.

The president of the American Board of Surgery, Dr. Jo Buyske, herself had to complete a formal re-entry program into surgical practice and stated in an 2018 article from General Surgery News that "after several days in the OR, I was back in the groove".

I am not aware of any changes in the department other than the hiring of three PA's, one for Dr. Flannery and two for general surgery. We have four general surgeons and Dr. Flannery, plus these PA's as a surgical team as far as I know. It appears that our surgical resources have grown although the call schedule certainly became more difficult for the four general surgeons, which is where I'm sure my absence had the greatest impact in terms of "resources".

Those involved with establishing Dr. Flannery's solo practice are well aware that I was going to fully support him - help train his PA, cover call for him when I am on call, and scrub with him on difficult cases. At least with regards to Dr. Flannery's practice, no-one at that time indicated that scrubbing with him would be an "undue hardship". Additionally, I have double scrubbed with Dr. Jimenez numerous times developing my skills relating to hernia repair without reproach.

As I have being working with my domestic violence therapist, Dr. Michelle Ronayne, we believe that I would only need assistance with the most challenging and complex intra-abdominal cases: perforated viscus, perforated colon, bowel resection, acute cholecystitis. Yes, this may take a few cases but is well worth it in terms of patient safety. I should be after a single proctoring, be able to perform appendectomies, both laparoscopic and open.

Furthermore, I am already prepared to do consults, both on the floor and in the ED, admissions and discharges. I certainly can perform simple cases such as Incision and Drainage, debridement including Fournier's gangrene, skin lesion excision, and port re-

Exhibit 1

moval.   As you know, I pride myself on providing safe and compassionate patient care.  I am even willing to do these less appealing cases for the other surgeons.

I am fully prepared to take all of the call I have missed, and in fact, I was going to propose to the group that I become the surgical "nocturnist" in order to do so. That would benefit the group, providing relief in terms of the rigors of general surgery call, and allow me to have post call days to focus on my personal priorities as well.

I am certainly willing and happy to fulfill other roles, such as greater involvement in the Wound Clinic, the Obesity Clinic, and hopefully regaining my role as the surgical clerkship director over time.

I do hope you will consider this modified accommodation.  I do understand continued discussions regarding this matter are necessary.   Again, this plan is approved by Dr. Ronayne and I believe I am perfectly capable of handling what is aforementioned stated.

Sincerely,

Elizabeth Honigsberg, MD FACS

Michelle Ronayne, Ph.D

Exhibit 1



## AMERICANS WITH DISABILITIES ACT (ADA) CERTIFICATION FORM

Name of Employee/Patient: ELIZABETH HOHLSBERL      Date: 12/17/2019

Employee's Position: ATTENDING SURGEON

Job Duties:  See attached Job Description

**Please answer the questions below and return this document within 7 days of the date above:**

Note:  Please do not provide a diagnosis:

**Note to Healthcare Provider:  The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information" as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.**

1. Does the employee have a physical or mental impairment?  ✓ Yes ___ No

2. Approximately how long is the expected duration of this impairment?
   *The nature of psychiatric diagnosis makes it difficult to determine*

3. Does the employee's impairment limit any major life activities? ✓ Yes ___ No

4. If so, which major life activities are impaired?
   *Social interactions*

5. Please review the attached job description.  After reviewing the description, can the Employee perform the essential functions of the job? ___ Yes ___ No
   *NO FORMAL JOB DESCRIPTION EXISTS FOR THIS POSITION. Question can't be answered without job description*

6. If the answer to #5 is no, please list the job functions that cannot be performed.
   *See attached accommodation letter dated 12/2*

7. Please describe any accommodations that would allow Employee to perform the

**PLAINTIFF'S EXHIBIT H**

Exhibit 1

essential functions of the job.

See attached letter dated
12/2
& Weekly therapy, Croup therapy
and monthly med management are on-going

8. How long do you anticipate the Employee requiring this accommodation?

Dr. Honigsberg feels that
a few cases of double scrubbing
complex abdominals will be
sufficient

9. When will the employee be reevaluated?

On-going

Provider Signature: *MSRonayne, PhD*

Print Name: MICHELLE RONAYNE Ph.D

Practice Address: 15 TRAFALGAR SQUARE #202

NASHUA, NH 03063

Telephone number: 603-883-0005

Date: 12/17/2019

4836-1903-5971, v. 1
2

Exhibit 1

December 2, 2019

Dear Dr. Dorf,

I am writing regarding my request to double scrub before returning to all the essential functions of my job. The American Board of Surgery established guidelines in 2012 regarding Re-entry to Surgical Practice. Now, these guideline pertain to Surgeons who have been out of practice for two or more years; thankfully my absence has only been approximately 6 months. However, the proctoring of Surgeons to ensure their surgical skills are intact is essential to safely car- ing for patients.

The president of the American Board of Surgery, Dr. Jo Buyske, herself had to complete a formal re-entry program into surgical practice and stated in an 2018 article from General Surgery News that "after several days in the OR, I was back in the groove".

I am not aware of any changes in the department other than the hiring of three PA's, one for Dr. Flannery and two for general surgery. We have four general surgeons and Dr. Flannery, plus these PA's as a surgical team as far as I know. It appears that our surgical resources have grown although the call schedule certainly became more difficult for the four general surgeons", which is where I'm sure my absence had the greatest impact in terms of "resources".

Those involved with establishing Dr. Flannery's solo practice are well aware that I was going to fully support him - help train his PA, cover call for him when I am on call, and scrub with him on difficult cases. At least with regards to Dr. Flannery's practice, no-one at that time indicated that scrubbing with him would be an "undue hardship". Additionally, I have double scrubbed with Dr. Jimenez numerous times developing my skills relating to hernia repair without reproach.

As I have being working with my domestic violence therapist, Dr. Michelle Ronayne, we believe that I would only need assistance with the most challenging and complex intra-abdominal cases: perforated viscus, perforated colon, bowel resection, acute cholecystitis. Yes, this may take a few cases but is well worth it in terms of patient safety. I should be after a single proctoring, be able to perform appendectomies, both laparoscopic and open.

Furthermore, I am already prepared to do consults, both on the floor and in the ED, admissions and discharges. I certainly can perform simple cases such as Incision and Drainage, debridement including Fournier's gangrene, skin lesion excision, and port re-

Exhibit 1

moval.   As you know, I pride myself on providing safe and compassionate patient care.  I am even willing to do these less appealing cases for the other surgeons.

I am fully prepared to take all of the call I have missed, and in fact, I was going to propose to the group that I become the surgical "nocturnist" in order to do so. That would benefit the group, providing relief in terms of the rigors of general surgery call, and allow me to have post call days to focus on my personal priorities as well.

I am certainly willing and happy to fulfill other roles, such as greater involvement in the Wound Clinic, the Obesity Clinic, and hopefully regaining my role as the surgical clerkship director over time.

I do hope you will consider this modified accommodation.  I do understand continued discussions regarding this matter are necessary.   Again, this plan is approved by Dr. Ronayne and I believe I am perfectly capable of handling what is aforementioned stated.

Sincerely,

Elizabeth Honigsberg, MD FACS

Michelle Ronayne, Ph.D

Exhibit 1

**From:** Elizabeth Honigsberg <EHONIGSBERGMD@GMAIL.COM>
**Date:** December 23, 2019 at 5:20:53 PM EST
**To:** Robert.Dorf@snhhs.org
**Subject: Interactive process**

December 23, 2019

Dear Dr. Dorf,

I have been advised by counsel to reach out to you regarding this interactive process whereby I hope to discuss obtaining a reasonable accommodation and my return to work. During my leave from work, my treatment team has made it their goal to ensure that I return prepared, ready to fulfill all of my essential duties, and to fulfill them safely. I am eager to return to surgical practice, and I hope my priorities as a surgeon in terms of patient care were obvious to you: provide compassionate care, uphold the current standards of care, and operate safely.

This is why I am requesting what I believe to be a "reasonable accommodation." I am certain I am ready to consult, admit, discharge, manage peri-operative care, and perform the more simple operations. I am only requesting assistance in the more complex abdominal cases such as perforated viscus, perforated bowel, urgent/emergent cholecystectomy, etc. This should only be for a short duration as I do believe I will re-acclimate to the operating room quickly. Obviously, this is for patient safety.

With regards to the cause of my leave, as I previously stated in prior emails, my treatment team is lead by a domestic violence specialist, Dr. Michelle Ronayne, and I see Dr. Ronayne for individual therapy every Tuesday sometime between 11am and 1pm. Additionally, I obviously had to reach out to Dr. Sally Garhart, the Director of the New Hampshire Professional Health Program, for professional guidance. She was kind enough to direct aspects of my care and recovery as well, referring me to an outpatient program for Women and Trauma. I will be attending group therapy every other Tuesday evening from 7pm to 8pm. Finally, I have a physician, Dr. Richard Tomb, managing my medications as needed and see him approximately once per month.

My domestic violence therapy has been ongoing since the incident in June and I built the aforementioned team over the summer. Dr. Ronayne and I agree that the acute phase of PTSD has resolved, and as she explained to me, there is now the chronic phase which will require ongoing treatment. Since I have a team of providers, I will try to the best of my ability to schedule appointments such that my work is not affected.

I understand that my particular situation is unusual and not as clear cut as something like substance abuse, in terms of monitoring a particular provider, but Dr. Ronayne is confident I will continue to do well and she can provide updates as required. As I have stated in previous emails, I am happy to provide the necessary releases for these providers.

If my proposed plan for reasonable accommodation is not acceptable to you, I graciously ask that you provide all of the reasons my accommodation request cannot be met. I also ask that we discuss any alternatives deemed available by you, should you not approve my accommodation as requested. I ask the foregoing so

PLAINTIFF'S EXHIBIT

Exhibit 1

that I may confer with my treatment team about how to accommodate my disability as we move through this interactive process. Because my treatment team would want to be notified of any alternative plan, I respectfully ask for 10 business days to discuss any modifications to my requested accommodation with my treatment team.

I look forward to continuing this discussion so I may return to the work I so dearly love and provide the exceptional care you expect from your surgeons.

Very best regards,

Elizabeth Honigsberg, MD FACS

Exhibit 1



The Counseling Center
OF NEW ENGLAND

December 17, 2019

To Whom It May Concern:

As stated in the document dated 12/2/2019 regarding accommodations Dr. Honigsberg would require to return to work, she was cleared to return as of that date- 12/2/2019.

Sincerely,

Michelle E. Ronayne, PhD
The Counseling Center
15 Trafalgar Square
Nashua, NH
603-883-0005 x347

Exhibit 1

## AMERICANS WITH DISABILITIES ACT (ADA) CERTIFICATION FORM

Name of Employee/Patient: ELIZABETH HOHLSBERL    Date: 12/17/2019
Employee's Position: ATTENDING SURGEON
Job Duties:  See attached Job Description

**Please answer the questions below and return this document within 7 days of the date above:**

Note:  Please do not provide a diagnosis:

**Note to Healthcare Provider:  The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information" as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.**

1. Does the employee have a physical or mental impairment?  ✓ Yes ___No

2. Approximately how long is the expected duration of this impairment?
   _The nature of psychiatric diagnosis makes it difficult to determine_

3. Does the employee's impairment limit any major life activities? ✓ Yes ___No

4. If so, which major life activities are impaired?
   _Social interactions_

5. Please review the attached job description.  After reviewing the description, can the Employee perform the essential functions of the job? ___Yes ___No
   NO FORMAL JOB DESCRIPTION EXISTS FOR THIS POSITION
   _Question can't be answered without job description_

6. If the answer to #5 is no, please list the job functions that cannot be performed.
   _See attached accommodation letter dated 12/2_

7. Please describe any accommodations that would allow Employee to perform the

Exhibit 1

essential functions of the job.

_See attached letter dated_
_12/2_
_Ex. Weekly therapy, group therapy_
_and monthly med management are on-going_

8. How long do you anticipate the Employee requiring this accommodation?

_Dr. Thungsberg feels that_
_a few cases of double scrubbing_
_complex abdominals will be_
_sufficient_

9. When will the employee be reevaluated?

_On-going_

Provider Signature: _MERonayne, PhD_

Print Name: _MICHELLE RONAYNE Ph.D_

Practice Address: _15 TRAFALGAR SQUARE #202_

_NASHUA, NH  03063_

Telephone number: _603-883-0005_

Date: _12/17/2019_

4836-1903-3371 v. 1
2

Exhibit 1

December 2, 2019

Dear Dr. Dorf,

I am writing regarding my request to double scrub before returning to all the essential functions of my job. The American Board of Surgery established guidelines in 2012 regarding Re-entry to Surgical Practice. Now, these guideline pertain to Surgeons who have been out of practice for two or more years; thankfully my absence has only been approximately 6 months. However, the proctoring of Surgeons to ensure their surgical skills are intact is essential to safely car- ing for patients.

The president of the American Board of Surgery, Dr. Jo Buyske, herself had to complete a formal re-entry program into surgical practice and stated in an 2018 article from General Surgery News that "after several days in the OR, I was back in the groove".

I am not aware of any changes in the department other than the hiring of three PA's, one for Dr. Flannery and two for general surgery. We have four general surgeons and Dr. Flannery, plus these PA's as a surgical team as far as I know. It appears that our surgical resources have grown although the call schedule certainly became more difficult for the four general surgeons, which is where I'm sure my absence had the greatest impact in terms of "resources".

Those involved with establishing Dr. Flannery's solo practice are well aware that I was going to fully support him - help train his PA, cover call for him when I am on call, and scrub with him on difficult cases. At least with regards to Dr. Flannery's practice, no-one at that time indicated that scrubbing with him would be an "undue hardship". Additionally, I have double scrubbed with Dr. Jimenez numerous times developing my skills relating to hernia repair without reproach.

As I have being working with my domestic violence therapist, Dr. Michelle Ronayne, we believe that I would only need assistance with the most challenging and complex intra-abdominal cases: perforated viscus, perforated colon, bowel resection, acute cholecystitis. Yes, this may take a few cases but is well worth it in terms of patient safety. I should be after a single proctoring, be able to perform appendectomies, both laparoscopic and open.

Furthermore, I am already prepared to do consults, both on the floor and in the ED, admissions and discharges. I certainly can perform simple cases such as Incision and Drainage, debridement including Fournier's gangrene, skin lesion excision, and port re-

Exhibit 1

moval.   As you know, I pride myself on providing safe and compassionate patient care.  I am even willing to do these less appealing cases for the other surgeons.

I am fully prepared to take all of the call I have missed, and in fact, I was going to propose to the group that I become the surgical "nocturnist" in order to do so. That would benefit the group, providing relief in terms of the rigors of general surgery call, and allow me to have post call days to focus on my personal priorities as well.

I am certainly willing and happy to fulfill other roles, such as greater involvement in the Wound Clinic, the Obesity Clinic, and hopefully regaining my role as the surgical clerkship director over time.

I do hope you will consider this modified accommodation.  I do understand continued discussions regarding this matter are necessary.   Again, this plan is approved by Dr. Ronayne and I believe I am perfectly capable of handling what is aforementioned stated.

Sincerely,

Elizabeth Honigsberg, MD FACS

Michelle Ronayne, Ph.D

Exhibit 1

**From:** Elizabeth Honigsberg
**Sent:** Monday, December 30, 2019 4:45 PM
**To:** Fallon, Pamela
**Subject:** Update Forms


Good evening Pamela,

I hope you had a lovely Christmas and Happy New Year!!

I am attaching my most recent clearance/ADA forms for your records as I am hoping to return to work soon.

Very Best Regards,
Elizabeth Honigsberg MD FACS



PLAINTIFF'S
EXHIBIT
J

Exhibit 1

**The Counseling Center**
OF NEW ENGLAND

December 17, 2019

To Whom It May Concern:

As stated in the document dated 12/2/2019 regarding accommodations Dr.
Honigsberg would require to return to work, she was cleared to return as of that
date- 12/2/2019.

Sincerely,

*Michelle E Ronayne, PhD*

Michelle E. Ronayne, PhD
The Counseling Center
15 Trafalgar Square
Nashua, NH
603-883-0005 x347

Exhibit 1



<u>**AMERICANS WITH DISABILITIES ACT (ADA) CERTIFICATION FORM**</u>

Name of Employee/Patient: ELIZABETH HOHLSBERL   Date: 12/17/2019

Employee's Position: ATTENDING SURGEON

Job Duties:  See attached Job Description

**Please answer the questions below and return this document within 7 days of the date above:**

Note:  Please do not provide a diagnosis:

**Note to Healthcare Provider:**  The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information" as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

1. Does the employee have a physical or mental impairment?  ✓ Yes   ___No

2. Approximately how long is the expected duration of this impairment?
   *The nature of psychiatric diagnosis makes it difficult to determine*

3. Does the employee's impairment limit any major life activities? ✓ Yes   ___No

4. If so, which major life activities are impaired?
   *Social interactions*

5. Please review the attached job description.  After reviewing the description, can the Employee perform the essential functions of the job?  ___Yes   ___No
   *NO FORMAL JOB DESCRIPTION EXISTS FOR THIS POSITION*
   *Question can't be answered without job description*

6. If the answer to #5 is no, please list the job functions that cannot be performed.
   *See actual accommodation*

7. Please describe any accommodations that would allow Employee to perform the

Exhibit 1

essential functions of the job.

_See attached letter dated_
_12 2_
_I d this , Cro therapy_
_and monthly , management are on-going_

8. How long do you anticipate the Employee requiring this accommodation?)

_i . tonics ber , that_
_few es do le scrubbing_
_c od minals will be_
_sufficient_

9. When will the employee be reevaluated?

_- C inC_

Provider Signature: _kona e nD_

Print Name: _MICHELLE BONAYNE Ph.D_

Practice Address: _15 TRAFALGAR SQUARE #202_

_NASHUA , NH 0301_

Telephone number: _603 - 883-_

Date: _12|17|2019_

4856-1903-5971, v. 1
2

Exhibit 1

**From: Elizabeth Honigsberg** <ehonigsbergmd@gmail.com>
Date: Thu, Feb 6, 2020 at 3:30 PM
Subject: Follow up
To: Dorf, Robert <Robert.Dorf@snhhs.org>

Good afternoon Dr. Dorf,

I write today to recap and follow up on our meeting last week on Tuesday, January 28th.

First, I want to thank you again for attending our "interactive process" meeting. I truly appreciate your presence at the meeting and your help in its scheduling. Additionally, your support during the meeting was certainly welcome, as I was not prepared for my colleagues' reaction to my absence and to my requested accommodation.

To recap the meeting, and as you know, I proposed several alternative accommodations and/or ideas that could be implemented in addition to my requested accommodation to make the accommodation period easier for the surgical department. For example, I proposed that I perform emergency surgeries only. That proposal was not accepted. Second, I proposed that I return all of the coverage that other surgeons have provided, particularly call which no general surgeon likes. In reply, Dr. Tsparlis stated "we are way past that point." Third, I also proposed becoming a "nocturnist," and I thought that offer would be appealing to all, as I could provide this important service to the hospital, the department, and to the individual surgeons, as well as myself. However, Dr. Flannery and Dr. Howe indicated that the department would not be willing to call another surgeon in at night if that became necessary. I then proposed that the assistance of a PA, as opposed to a surgeon, to satisfy my request for accommodation and even offered to pay for the expense of PA assistance out of pocket. However, I learned that PA's only work until 5pm and the department will not call them in at night as it would disrupt the current structure.

In short, I was surprised that all of these proposals were not well received by our surgical department. I thought that the department might suggest some alternative accommodations since it appears that the department has rejected both of my requested accommodations and the alternatives I proposed. However, my impression from the surgeons' statements at the meeting was that the department is only willing to allow me to return when I am no longer disabled and/or no longer require an accommodation.

To that effect, Dr. Flannery asked me when I can return. I explained that I was cleared to return as of December 1st with the provision of a reasonable accommodation, but I must clear with my treatment team any modification to or alternative accommodation approved by FMP before returning. The group seemed to protest, asking "but we thought you were already cleared?" I explained that, since October of 2019, I have significantly reduced my requested accommodations several times because FMP has not approved them. Dr. Howe then asked, "when do you plan on working like the rest of us?" Since Dr. Flannery does not take general surgery call and Dr. Howe does not perform acute care surgeries, it seems that "working like the rest of us" means without a disability and/or without needing an accommodation. Finally, Dr. Flannery asked me about my children and stated "you must have a nanny." I explained that, while I intend to hire a nanny eventually, my current financial state does not allow me to hire one at this time. Dr. Flannery replied, "okay, but the nanny thing is required."

Thus, I write to you today to check in with you on whether FMP will suggest alternative accommodations or whether FMP has reconsidered its rejection of my requested accommodations and/or the alternative possibilities that I presented at our meeting. Please let me know if there is anything I can do to be of assistance to FMP while it considers my request for accommodation. As you know, I am very eager to return to active surgical practice for many reasons including, most importantly, that I love what I do and want to return to the services I may provide to the hospital and the department. This urgency to return is practical as well, as my financial resources are being exhausted. I am also concerned with this delay in my return for licensure reasons; Dr. Sally Garhart graciously continues to advise regarding this.



PLAINTIFF'S
EXHIBIT
K
Exhibit 1

Thank you again for everything you are doing for me and I look forward to hearing from you, as we continue this "interactive process." I do hope we can come to a solution regarding my return in the near future.

Very best regards,
Elizabeth Honigsberg MD FACS

Exhibit 1

From: **Elizabeth Honigsberg** <ehonigsbergmd@gmail.com>
Date: Tue, Feb 11, 2020 at 1:40 PM
Subject: Update re: benefits
To: Dorf, Robert <Robert.Dorf@snhhs.org>

February 10, 2020

Good afternoon Dr. Dorf,

I have been contacted by The Standard regarding a new claim that was created without my knowledge regarding an application fordisability benefits. I did email Cathy DiGeronimo in HR regarding this new claim without response. I did lose my disability benefits on December 1st when I was cleared to return with a request for limited accommodation.

From my understanding, these new benefits may provide me with back pay going back to December 1, 2019 (the original date that Dr. Ronayne cleared me to return to work with accommodation). I am not even sure that I am eligible for the benefits, but I have decided to complete the application process solely as an effort to possibly alleviate the financial strain I am under from my extended absence.

Please know that I am willing, able, and excited to return to work once we reach a determination regarding my request for an ADA accommodation. If I am approved for disability benefits, I understand from conversations with Dr. Ronayne that once she evaluates and signs off on any accommodation approved by FMP, she will clear me again to return to work, despite any disability benefits. And, based on my prior experience with the Standard, my disability benefits will be terminated as of new clearance date.

In short, while I am applying for disability benefits to alleviate my financial strain, I am still capable of working with a reasonable accommodation to my disability. I do not require any help from you to complete this application process, but I just wanted to keep you in the loop.

Thank you again for all of your efforts to get me back to work.

Sincerely,
Elizabeth Honigsberg MD FACS



PLAINTIFF'S
EXHIBIT
L

Exhibit 1

Exhibit 1

**From:** EHonigsbergMD@gmail.com
**Date:** February 17, 2020 at 4:49:05 PM EST
**To:** Robert Dorf <Robert.Dorf@snhhs.org>
**Subject: Follow up**

Good afternoon Dr. Dorf

Hope all is well. I wanted to follow up with you again regarding our January 28th meeting since, as of this Tuesday February 13th, three weeks will have passed since we met. I am hoping you have had an opportunity to review my February 6th letter (via email) which re-capped our January 28th meeting and similarly inquired as to any progress made since then. Thus, I am writing again today to ascertain whether any progress has been made by FMP regarding my request for reasonable, minimal accommodation or, alternatively, to see if other proposals for accommodation have been entertained.

In terms of alternatives, another alternative has come to my attention since we last met. Another physician has recently provided with me information regarding becoming board certified in Obesity Medicine which entails a 3 day course at MGH in June and sitting for my boards in 2021. This is yet another option of which I was unaware until now which could potentially be of benefit to the Obesity Clinic which you invited me to be a part of back In June.

Because I am in a position of sincere financial peril now and must provide for my children who have been deemed "special needs" given their own trauma, expressive speech delay, and now behavioral regression, it becomes more and more imperative with each passing day that I return to work as soon as possible. My need to return to work by June due to licensing concerns is an issue that continues to loom as well.

I do hope that FMP can come to a decision soon. I can return to work and be the devoted surgeon I have always tried to be. Thank you.



PLAINTIFF'S EXHIBIT

Exhibit 1

Very best regards,
Elizabeth Honigsberg MD FACS

Sent from my iPhone

Exhibit 1



Southern New Hampshire
**Medical** Center

March 24, 2020

Elizabeth Honigsberg, MD
34 Franklin Street
Nashua, NH  03064

Dear Dr. Honigsberg:

On behalf of the Medical Staff Leadership, the Medical Executive Committee and the Medical Staff, we would like to extend our gratitude for all that you have done for the Medical Center. It is with regret that I accept your resignation and we wish you continued success in your future endeavors.  Please note the following information for your records:

**Appointment Date:** **03/01/2017**
**Resignation Date:**  **02/13/2020**
**Department(s):**      **Surgery**

Feel free to contact the Medical Staff Office at 603-577-2718 with any questions or comments.

Sincerely,

Michael Rose
President/CEO



PLAINTIFF'S
EXHIBIT
**N**

8 Prospect Street
PO Box 2014
Nashua, NH 03061
603.577.2000

snhhealth.org

Exhibit 1



Southern New Hampshire
**Medical** Center

March 27, 2020

Elizabeth Honigsberg, MD
34 Franklin Street
Nashua, NH  03064

Dear Dr. Honigsberg:

On behalf of the Medical Staff Leadership, the Medical Executive Committee and the Medical Staff, we would like to extend our gratitude for all that you have done for the Medical Center. It is with regret that I accept your resignation and we wish you continued success in your future endeavors.  Please note the following information for your records:

**Appointment Date:** 03/01/2017
**Resignation Date:**   08/11/2020
**Department(s):**        Surgery

Feel free to contact the Medical Staff Office at 603-577-2718 with any questions or comments.

Sincerely,

Michael Rose
President/CEO

8 Prospect Street
PO Box 2014
Nashua, NH 03061
603 577.2000

snhhealth.org

Exhibit 1