Filed
File Date: 10/25/2023 3:10 PM
Hillsborough Superior Court Southern District
E-Filed Document

## THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS                                                        SUPERIOR COURT
SOUTHERN DISTRICT

Dr. Elizabeth Honigsberg
34 Franklin Street #335
Nashua, NH 03064

v.

Southern New Hampshire Health System, Inc.
8 Prospect Street
Nashua, NH 03061

and

Southern New Hampshire Medical Center
8 Prospect Street
Nashua, NH 03061

and

Foundation Medical Partners, Inc.
d/b/a Foundation Surgery
8 Prospect Street
Nashua, NH 03061

---

## **FIRST AMENDED COMPLAINT**
### *Jury Trial Demanded*

---

## I.      PRELIMINARY STATEMENT

After a six-month absence from surgical practice due to a disabling, serious health condition, Dr. Honigsberg was cleared to return to work with reasonable accommodations to disability. When she relayed this to her employers and colleagues, they asked: "**when do you plan on working like the rest of us?**"

Exhibit 2

That single question thematically characterizes Defendants' disposition during the months leading up to Defendants' termination of Dr. Honigsberg. Although it was feasible and not unduly burdensome for Defendant to reasonably accommodate Dr. Honigsberg's disability, <u>they simply did not **want** to</u>, because they were "frustrated" that Dr. Honigsberg's FMLA absence inconvenienced them, asserting that it caused a "strain" and was "disruptive." In other words, Defendants refused to accommodate Dr. Honigsberg's disability **because** she engaged in legally protected FMLA leave taking.

At every step, Dr. Honigsberg's focus was patient safety: that is why, upon return from a six-month absence from surgical practice, she requested accommodations designed to ensure, beyond all possible doubt, that patient safety remained the utmost priority. It is therefore unlawful, ironic, and plain shameful that Dr. Honigsberg's commitment to patient safety, and her request for reasonable accommodations to ensure same, came at the expense of her job. That is compounded by Defendants' manufacturing of false statements about Dr. Honigsberg in the course of terminating her employment, including allegations that her requests for accommodation rendered her unsafe to perform surgery. While such wanton, malicious and oppressive conduct plainly runs afoul of RSA 354-A's prohibition on disability discrimination in employment, it also subjects Defendants to liability for enhanced compensatory damages.

## II.   **PARTIES**

1.      Plaintiff Dr. Elizabeth Honigsberg is a New Hampshire citizen residing in Nashua, New Hampshire.

2.      Southern New Hampshire Health System (SNHHS) is a domestic nonprofit corporation registered with the State of New Hampshire with a  principal place of business at 8

Exhibit 2

Prospect Street in Nashua, NH. SNHHS includes both Foundation Medical Partners (FMP) and Southern New Hampshire Medical Center ("SNHMC" or "the Medical Center"). Exhibit A.

3.     FMP is a domestic nonprofit corporation registered with the State of New Hampshire with a  principal place of business at 8 Prospect Street in Nashua, NH. FMP is a multi-specialty provider group, including more than 300 providers in primary, specialty and immediate care serving patients in more than 70 practices across southern New Hampshire and northern Massachusetts. Id.

4.     SNHMC is a domestic nonprofit corporation registered with the State of New Hampshire with a  principal place of business at 8 Prospect Street in Nashua, NH. SNHMC is an acute care facility in Nashua, New Hampshire with a medical staff of over 500 primary and specialty care providers from FMP, Dartmouth-Hitchcock Nashua, and local independent practices. Id.

5.     SNHHS, FMP, and SNHMC were Dr. Honigsberg's joint and/or integrated employers as alleged herein more fully. Thus, Defendants are each legally responsible for the claims and resulting harms alleged herein.

III.     **JURISDICTION AND VENUE**

6.     Pursuant to RSA 491:7, this Court has jurisdiction over Dr. Honigsberg's claims arising under RSA 354-A.

7.     Pursuant to RSA 507:9, venue is proper in Hillsborough County, because Defendants' principal offices are in Hillsborough County.

IV.     **STATEMENT OF FACTS**

Exhibit 2

8.      In 2016, Dr. Honigsberg began discussions with Defendants about prospective employment.

9.      In September 2016, Dr. Ken Howe, SNHMC Chief Medical/Surgical Officer, wrote that "we would love to have [Dr. Honigsberg] join the group," noting her "experience and foregut skills" made her "a great addition." Exhibit Q. Susan DeSocio, then-FMP President/CEO, noted that Dr. Honigsberg was a "perfect fit" and "br[ought] additional surgery to us." Id.

10.     On September 30, 2016, Dr. Honigsberg received a letter from Ms. DeSocio, extending her an employment offer to join both FMP and SNHHS, which offer was contingent upon securing privileges at SNHMC. Exhibit B.

11.     On October 8, 2016, Dr. Honigsberg accepted the offer.

12.     On November 25, 2016, Dr. Honigsberg signed an employment agreement, which was fully completed with the signature of Ms. DeSocio on November 28, 2016. Exhibit C.

13.     The employment agreement provided, in part, that: (a) it was entered between Dr. Honigsberg and FMP, "an affiliate" of SNHHS; (b) FMP was "organized for the purpose of promoting the lawful interests of [SNHMC], by coordinating the delivery of health care;" (c) Dr. Honigsberg was hired to "provide services to patients" of both FMP and SNHMC; (d) the agreement was contingent upon Dr. Honigsberg "obtaining and maintaining…full and unrestricted Medical Staff membership and clinical privileges at the Medical Center;" (e) if Dr. Honigsberg "cease[d] to be an Active Member...of the Medical Center's Medical Staff for any reason," where "Active Member" was "defined in the Medical Staff By-laws" of SNHMC, then her agreement would "automatically terminate;" (f) Dr. Honigsberg was required to "abide at all times by the By-laws, Rules and Regulations, Policies and Procedures" of SNHMC, SNHMC Staff, and FMP; (g) Dr. Honigsberg was required to render a standard of care set by SNHMC's "Medical Staff By-

4

Exhibit 2

laws and Medical Staff Rules and Regulations, and the policies and procedures established by" SNHMC and/or FMP; and (h) Dr. Honigsberg's employment was subject to automatic termination at any time for failure to comply with the portions of the employment agreement summarized in the immediately preceding parts designated (d) through (g) herein. Exhibit C, p. 1, 4, 5, 7.

14.     Dr. Honigsberg's start date was on or about March 1, 2017.

15.     Under the agreement, Dr. Honigsberg completed her initial two-year term.  Because no party to the agreement terminated the employment relationship, Dr. Honigsberg's employment renewed for an additional one-year term on or about March 1, 2019.

   A.  ***Events leading up to Dr. Honigsberg's onset of disability***

16.     For approximately four years preceding Dr. Honigsberg's need for accommodation, she was the victim of domestic violence.

17.     Despite this, it never interfered with her surgical performance.

18.     On March 7, 2019, during a period of escalating domestic violence, Dr. Honigsberg was recognized by her superiors (including Dr. Timothy Scherer, SNHMC Chief Medical Officer) for handling a patient's concerns such that she turned the patient's experience around after the patient was frustrated by the treatment received from others at SNHMC. Exhibit D.

19.     It was in early or mid-March of 2019 that — for the first time — Dr. Honigsberg's struggle with domestic violence came to the attention of Dr. Scherer.

20.     Dr. Scherer's role as SNHMC's Chief Medical Officer placed him in a supervisory capacity over Dr. Honigsberg.

21.     Dr. Scherer called Dr. Honigsberg into his office and made inquiry into whether Dr. Honigsberg's situation was as dire as he was told.

Exhibit 2

22.     He then suggested that being a victim of domestic violence interfered with Dr. Honigsberg's medical judgment in transferring a patient from SNHMC's emergency room to a tertiary care center.

23.     When Dr. Honigsberg explained that she transferred the patient due to a lack of critical care resources at SNHMC, Dr. Scherer appeared satisfied.

24.     Dr. Scherer then discussed with Dr. Honigsberg her safety plan (i.e., her plan to keep her and her children safe as she prepared to leave the abusive environment).

25.     Once she described her safety plan in detail, Dr. Scherer seemed satisfied that Dr. Honigsberg had done all that she could.

26.     Shortly thereafter, on March 22, 2019, Dr. Robert Dorf, then Chief Medical Officer of FMP, emailed Dr. Honigsberg, requesting a meeting during her non-working hours.

27.     Dr. Dorf's role as FMP's Chief Medical Officer placed him in a supervisory capacity over Dr. Honigsberg.

28.     Dr. Honigsberg advised that she was unable to attend at that time due to childcare, and she asked if there were another time that the two could meet. Exhibit E, p. 2.

29.     Dr. Dorf ignored Dr. Honigsberg's inability to attend the meeting he requested during non-work hours, replying "its kinda important and **hopefully only once**." Id.

30.     Dr. Honigsberg stated that while she was unable to rearrange childcare, she would accommodate Dr. Dorf's schedule to the best of her ability. Id.

31.     Finally, Dr. Dorf stated that the two could meet at the end of the day, stating he had "been hearing some things" and was aware of Dr. Honigsberg's meeting with Dr. Scherer. Id.

32.     Dr. Honigsberg met with Dr. Dorf as scheduled.

Exhibit 2

33.     During the meeting, Dr. Dorf seemed skeptical about whether Dr. Honigsberg was overstating the domestic violence situation she was experiencing at home.

34.     Only after Dr. Honigsberg explained the situation that she was experiencing at home did Dr. Dorf begin to imply that he believed her.

35.     Dr. Dorf added, "you are not the same woman that I hired."

36.     Further, Dr. Dorf implied that Dr. Honigsberg being a victim of domestic violence was a situation not fitting of a surgeon.

37.     Dr. Honigsberg did not want to cause any difficulties for her employers, so she asked Dr. Dorf if there were a particular emergency department to which she should report, so as to avoid causing scandal in the event that she needed medical attention related to domestic violence injuries.

38.     Dr. Dorf gave Dr. Honigsberg permission to go to the SNHMC emergency room.

39.     Dr. Dorf then discussed Dr. Honigsberg's safety plan with her.

40.     Like Dr. Scherer, Dr. Dorf seemed satisfied with the safety plan upon Dr. Honigsberg's explanation.

### B.  *Onset of Dr. Honigsberg's Disability*

41.     When Dr. Honigsberg became disabled, she worked among a group of male surgeons including Dr. Ken Howe, Dr. Nick Tsaparlis, Dr. Sanjay Gupta, Dr. Luis Jiminez, and Dr. John Flannery.

42.     On the evening of June 3, 2019, Dr. Honigsberg suffered an incident of domestic violence in her home, which triggered her disability of PTSD and need for accommodation thereto.

43.     In addition, Dr. Honigsberg's PTSD was a serious health condition requiring continuing treatment by a health care provider.

Exhibit 2

44.     Within about a week of this incident, Dr. Honigsberg was formally diagnosed with acute post-traumatic stress disorder (PTSD).

45.     Dr. Honigsberg took leave under the Family and Medical Leave Act (FMLA) from June 4 until late-August of 2019. Dr. Honigsberg performed more than 1,250 hours of service for Defendants and was employed by Defendants for more than 12 months prior to taking leave. See ¶¶ 11, 12, 14, 15, supra. Defendants employed more than 50 employees within 75 miles of Dr. Honigsberg's worksite. See Exhibit A (Defendants employ more than 800 care providers).

46.     Approximately five weeks into Dr. Honigsberg's leave, Dr. Howe – copying his colleagues including Dr. Tsaparlis, Dr. Gupta, and Dr. Jiminez – sent an email to Dr. Dorf and other administration members lamenting "how disruptive it is to have a provider go out on sudden leave without prior notice" and "how disruptive it is when there is no return date for that provider," adding that the return date they had recently been told by administration "turned out to be false" and "we are CONSTANTLY changing clinic, OR and call schedules" causing a "strain on providers and staff." Exhibit R.

47.     One administrator, Eric Scheff, advised Dr. Howe that administration was working on scheduling a meeting with Dr. Howe's surgical group. Id.

48.     Nearly a week later, Mr. Scheff reported to fellow administrators that, although "the group was frustrated that [Dr. Honigsberg] did not come back when expected" and clinic and call schedules needed to be changed, Dr. Howe reported that "they are able to manage coverage…and the group is able to plan accordingly." Id.

49.     On August 22, 2019, Dr. Richard Tomb, one of Dr. Honigsberg's treating physicians, completed a SNHHS Americans with Disabilities Act (ADA) Certification Form

Exhibit 2

requesting accommodation to Dr. Honigsberg's disability in the form of leave time through November 1, 2019.

50.     The August 22 accommodation request was granted.

51.     In October 2019, Dr. Honigsberg saw Dr. Howe. When Dr. Honigsberg approached Dr. Howe and asked how he was, he curtly replied, "really, really busy," before walking away.

52.     On October 31, 2019, Dr. Michelle Ronayne, Dr. Honigsberg's treating therapist for her PTSD, completed a SNHHS ADA Certification Form requesting two accommodations: (1) the accommodation of 4-6 weeks of additional leave time and (2) the accommodation of double scrubbing with another surgeon until such time that Dr. Honigsberg was reacclimated to work and therefore confident enough that she could return to independent surgical practice.

53.     "Double scrubbing," a form of proctoring, means that two (2) surgeons perform surgery together, as opposed to a single surgeon. Proctoring is recommended by the American Board of Surgery (ABS) Guidelines on Re-Entry to Surgical Practice ("ABS Guidelines"). Exhibit O. The experience of ABS Executive Director Dr. Buyske as she re-entered surgical practice guided creation of the ABS Guidelines, which include development of a proctoring plan with decreasing supervision until the surgeon resumes independent surgery. Exhibit P, p. 2. Dr. Buyske publicly stated that the ABS guidelines are exactly that – guidelines – and is quoted as saying "each case is different and re-entry plans need to be individualized to reflect those nuances." Id.

54.     Dr. Dorf addressed the October 31 Form and Dr. Honigsberg's corresponding requests for accommodation by way of letter dated November 12, 2019. Exhibit F.

55.     Therein, Dr. Dorf stated that Dr. Honigsberg's first requested accommodation was granted. Id.

Exhibit 2

56.     However, Dr. Dorf stated that Dr. Honigsberg's second requested accommodation for double scrubbing — which would have enabled Dr. Honigsberg's return to work and performance of her position's essential functions as early as December 1, 2019 — was denied. Id.

57.     Dr. Dorf's letter indicated that Dr. Honigsberg's double scrubbing <u>accommodation request was denied **because** her "absence</u>," a protected activity both in the form of leave under the FMLA as well as an accommodation to disability, had inconvenienced the surgical department:

> To require the surgical team to double scrub **with you** would be an undue hardship. **Your absence** has resulted in less surgical resources and, in order to safely care for patients, we have no capacity to accommodate double scrubbing. The ability for our surgeons to operate independently is a critical component of our ability to provide timely and safe surgical care.

<u>Id</u>.

58.     Notably, Dr. Dorf's statement that "less surgical resources" caused a lack of "capacity to accommodate double scrubbing" does not withstand scrutiny given that surgical resources had been <u>added</u> to the department and that double scrubbing was done prior to the addition of surgical resources, as explained more thoroughly below.

59.     On December 9, 2019, Dr. Honigsberg, through counsel, sent Dr. Dorf a revised request for reasonable accommodation. <u>Exhibit G</u>.

60.     Therein, Dr. Honigsberg informed Dr. Dorf that, with continued treatment and assessment of Dr. Honigsberg's disability and the limitations thereof, Dr. Ronayne determined that the accommodation requested in the October 31 ADA Form was no longer necessary. <u>Id</u>. at 2.

61.     Rather, after evaluating Dr. Honigsberg's disability and its limitations in light of the essential functions of Dr. Honigsberg's position, Dr. Ronayne concluded that (1) Dr. Honigsberg could perform her position's essential functions with the lesser accommodation of double scrubbing for only the most challenging, complex surgical procedures, and (2) Dr.

Exhibit 2

Honigsberg would need this accommodation for a brief duration, only until she re-acclimated to the operating room. Id. at 2-3, 5-6. Together, Dr. Honigsberg and Dr. Ronayne drafted a revised request for accommodation which was attached to the December 9 letter. Id. at 5-6.

62.    Regarding the duration of the requested accommodation, Dr. Honigsberg drew analogy to the experience of ABS Executive Director Dr. Buyske, who was absent from practice for two (2) years but only required several days to adjust to resuming surgical practice. Id. at 2.

63.    At the time of the request, Dr. Honigsberg had been absent from surgical practice for only six months, i.e., less time that Dr. Buyske had been absent. Id. at 2.

64.    The December 9 request further explained why the revised accommodation was reasonable and feasible: (a) Dr. Honigsberg was aware of an increase in surgical resources by the addition of three physician assistants; (b) Dr. Honigsberg previously double scrubbed to the benefit of Dr. Flannery as his "back up" surgeon when he began performing surgery outside the scope of his typical colorectal practice, which was prior to the increase in surgical resources; (c) Dr. Honigsberg previously double scrubbed with Dr. Jiminez on numerous occasions as a mentee in order to develop her skills in hernia-related surgery; and (d) it was common that elective practice surgeons often did not have enough elective surgeries to perform. Id. at 3-4.

65.    In her December 9 request, Dr. Honigsberg even offered to take additional steps in an effort to alleviate any impact that her medically-related absence had imposed on her colleagues. Specifically, she offered to take on a call schedule commensurate with the time she had missed, offered to become the "surgical nocturnist" to relieve the rigors of the call schedule for other surgeons, and offered to take on roles less appealing to her fellow surgeons such as roles in the Wound and Obesity Clinics. Id. at 4.

Exhibit 2

66.     First, upon receiving Dr. Honigsberg's December 9 letter, along with her doctor's signed letter, FMP directed Dr. Honigsberg to have her doctor complete an additional ADA form.

67.     On December 17, 2019, Dr. Honigsberg complied with that directive. Exhibit H.

68.     Second, FMP directed Dr. Honigsberg to reach out to Dr. Dorf directly, as opposed to through legal counsel, to request reasonable accommodation.

69.     On December 23, 2019, Dr. Honigsberg complied with that directive. Exhibit I.

70.     Third, FMP directed Dr. Honigsberg to provide a letter from her doctor to Employee Health Services stating that she was cleared to return to work.

71.     On December 30, 2019, Dr. Honigsberg complied with that directive. Exhibit J.

72.     By January 7, 2020, Dr. Honigsberg had not heard from Dr. Dorf in the two weeks that had passed since her December 23 communication to him.

73.     Dr. Honigsberg's counsel therefore contacted FMP's counsel regarding the delay in response, as it was impeding Dr. Honigsberg's return to work despite having been cleared to return with reasonable accommodations five weeks earlier.

74.     This inquiry prompted Dr. Dorf's assertion that, although he replied to Dr. Honigsberg's accommodation request on December 31, 2019, he had mistakenly sent the email to Dr. Honigsberg's work email address.

75.     At that time, Dr. Dorf knew that Dr. Honigsberg did not have access to work email.

76.     On January 8, 2020, Dr. Honigsberg finally heard from Dr. Dorf, and he asked her to meet with the surgical team to discuss her requested accommodations, stating, in part: "In order to consider your accommodation request to return to work...I require input from the surgeons who would work with you and would proctor you, as their input and **consent** is critical."

Exhibit 2

77.     On January 10, Dr. Honigsberg agreed and asked Dr. Dorf to identify who would attend. So that she could focus full attention on the meeting, Dr. Honigsberg further asked if she could bring someone to take notes for her or, alternatively, if she could record the meeting.

78.     Dr. Dorf responded that those attending the meeting would be "all people you have worked well with in the past and who know you." More specifically, Dr. Dorf asserted that Dr. Howe (the author of the July 9, 2019, "Practice Disruption" email sent a mere five weeks into Dr. Honigsberg's protected FMLA leave) along Dr. Tsaparlis (copied on said email) would attend the meeting to give their input and consent to Dr. Honigsberg's requested accommodations.

79.     Dr. Dorf did <u>not</u> consent to Dr. Honigsberg's request to bring a note taker, nor did he consent to Dr. Honigsberg's request to record the meeting.

80.     On January 21, all parties finally agreed to a meeting date.

**C.  <u>The January 28th Meeting</u>**

81.     On January 28, 2020, nearly two months after Dr. Honigsberg had been cleared to return to work with reasonable accommodation, she met with Dr. Dorf along with her colleagues Dr. John Flannery, Dr. Nick Tsparlis, Dr. Ken Howe.

82.     The meeting lasted less than 30 minutes.

83.     At the start of the meeting, Dr. Honigsberg attempted to explain that her absence and need for accommodation was due to a disability and its resulting limitations, and not due to anything which rumors may have indicated.

84.     Dr. Dorf interrupted Dr. Honigsberg, stating that he wanted to avoid discussing the reason for her absence so as to not "make this a personal thing."

85.     During the meeting, Dr. Honigsberg proposed several alternative accommodations and/or proposals that could be implemented, in addition to the double scrubbing accommodation

Exhibit 2

request, in an effort to incentivize them to grant her request for a double scrubbing accommodation, even though it was feasible without the need for alternative accommodations or proposals.

86.     The Surgeons and/or Dr. Dorf immediately rejected each of those proposed alternatives, giving Dr. Honigsberg's proposed accommodations no consideration.

87.     For example, Dr. Honigsberg proposed that she might perform emergency surgeries only.

88.     Dr. Honigsberg thought this proposal would be well received, because it would give the other surgeons the freedom to pursue their individual elective practices, a generally sought-after opportunity among surgeons.

89.     Further, performing emergency surgeries only would have provided Dr. Honigsberg the ability to rebuild her confidence in the operating room by doing something she was familiar with as she had performed emergency surgeries for over 6 years.

90.     That proposal was rejected by the meeting attendees.

91.     No alternative proposal was made by the meeting attendees.

92.     Second, Dr. Honigsberg proposed that she could provide an amount of coverage commensurate to the coverage that the other surgeons provided during her medically-related absence, particularly call coverage, something generally despised by surgeons.

93.     Again, that proposal was rejected by the meeting attendees.

94.     No alternative proposal was made by the meeting attendees.

95.     Rather, Dr. Tsparlis replied, "we are way past that point."

96.     Third, Dr. Honigsberg also proposed that she might become a "nocturnist" surgeon.

97.     Dr. Honigsberg thought this proposal might be appealing because it would make it so that the other surgeons did not have to work at night.

Exhibit 2

98.     Again, that proposal was rejected by the meeting attendees.

99.     No alternative proposal was made by the meeting attendees.

100.    Rather, Dr. Flannery and Dr. Howe indicated that, with respect to Dr. Honigsberg's request for a double scrubbing accommodation, the department would not be willing to call another surgeon in at night for double scrubbing.

101.    Dr. Honigsberg then proposed that the assistance of a Physician's Assistant (PA) might work, and she even offered to pay for the expense of PA assistance out of her own pocket.

102.    Again, that proposal was rejected by the meeting attendees.

103.    No alternative proposal was made by the meeting attendees.

104.    Rather, Dr. Honigsberg was told that Pas only work until 5:00 PM, and the department was not willing to "disrupt the current structure" by having Pas work at night.

105.    Dr. Honigsberg then reiterated that, as her December 9 letter stated, she anticipated needing to double scrub on only a few cases and for a very limited duration of time.

106.    More specifically, Dr. Honigsberg stated words to the effect: "All I am asking for is to double scrub in on a few cases like a colon case with John [Flannery], a bowel obstruction case with Nick [Tsparlis], or a [Sanjay] Gupta gallbladder. Jo Buyske [ABS Executive Director] only needed a few days to get back into the OR [operating room]."

107.    Neither the Surgeons nor Dr. Dorf responded, thereby passively rejecting  the explained accommodation.

108.    No alternative proposal for accommodating Dr. Honigsberg's disability was made by the meeting attendees.

Exhibit 2

109.   In sum, the Surgeons and Dr. Dorf rejected <u>all</u> of Dr. Honigsberg's proposed accommodations <u>without consideration or discussion</u>, and they proposed no alternative accommodations.

110.   Rather, the Surgeons and Dr. Dorf communicated that Dr. Honigsberg's return to work had two prerequisites: (1) Dr. Honigsberg either would need to be non-disabled or be able to work without any accommodations; and (2) Dr. Honigsberg would need to take action which would demonstrate to the surgeons that her role as a mother would not interfere with work.

111.   When Dr. Flannery asked <u>when</u> Dr. Honigsberg could return, she reiterated that she was cleared to return as of December 1st with reasonable accommodations of her disability, and she would return as soon as she was accommodated in a manner cleared by her doctor.

112.   The Surgeons rejected this explanation, asking "but we thought you were already cleared [to return to work]?"

113.   In other words, they rejected that Dr. Honigsberg was cleared to return to work if she still required accommodations in the workplace.

114.   Dr. Honigsberg explained that, since October of 2019, she had modified her requested accommodations several times and proposed alternative ideas and accommodations, both because FMP had rejected her requests for accommodation in the workplace and because of continued improvements with her disabling medical condition, but at that moment, she was cleared to return to work with reasonable accommodations for her disability.

115.   Dr. Howe asked Dr. Honigsberg, "when do you plan on **<u>working like the rest of us</u>**?"

116.   In other words, Dr. Howe asked when Dr. Honigsberg "plan[ned]" on working without accommodation to her disability or without disability.

16

Exhibit 2

117.    Dr. Honigsberg understood that "working like the rest of us" could only have that one meaning.

118.    Finally, Dr. Flannery mentioned Dr. Honigsberg's role as a mother.

119.    He told Dr. Honigsberg, "you must have a nanny."

120.    Dr. Honigsberg explained that she had intended to hire a nanny but, due to her return to work having been extended significantly beyond December when she was initially cleared to return with accommodations, her financial situation prohibited her from doing so.

121.    Regardless, Dr. Honigsberg assured Dr. Flannery that childcare would not be an issue, stating that she was renting a three-bedroom near work so that she could hire an overnight nanny upon her return to work because, then, finances would permit her to do so.

122.    Dr. Flannery responded, "okay, but the nanny thing is required."

123.    When the subject of holiday call came up, Dr. Honigsberg stated that she would be willing to cover nearly all holiday call (though certainly not required) with the exception of Mothers' Day and Halloween, but she noted that there was some uncertainty because a parenting schedule had not yet been worked out.

124.    In response, Dr. Howe shook his head and rolled his eyes.

### D.   *Aftermath of the January 28th Meeting*

125.    As of February 6, 2020, Dr. Honigsberg still had not heard from Dr. Dorf nor any of the surgeons, so she sent Dr. Dorf a follow up email fully describing the communications exchanged during the January 28th meeting. Exhibit K.

126.    Dr. Honigsberg asked whether alternative accommodations would be proposed or whether the many accommodations and proposals she had suggested, all of which were rejected,

Exhibit 2

might be reconsidered. Dr. Honigsberg further encouraged Dr. Dorf to reach out to her if she could be of any assistance to the consideration of her accommodation requests. Id.

127.    Lastly, Dr. Honigsberg stressed both that she was eager to return to work and the long delay was causing her significant harm, including financial peril and the looming threat of losing her licensing credentials. Id.

128.    When Dr. Honigsberg sent the above email to Dr. Dorf, she had been cleared to return to work for nearly ten weeks.

129.    On February 11, Dr. Honigsberg emailed Dr. Dorf to update him regarding her long-term disability benefits after FMP's insurance carrier reached out to her. Dr. Honigsberg advised that, although she remained willing and capable of returning to work with accommodation, she decided to apply for long-term disability benefits to alleviate the financial strain that the prolonged interactive process had caused, because such benefits would give her wages going back to December 1, 2019, when she had lost her short-term disability benefits because her doctor had cleared her to return to work. Exhibit L.

130.    By February 17, Dr. Honigsberg still had not heard from Dr. Dorf.

131.    She therefore sent another follow up email asking whether any progress had been made with respect to considering potential accommodations. Dr. Honigsberg proposed yet another reasonable alternative accommodation for FMP's consideration, and she reiterated the harm she was suffering due to her prolonged absence. Exhibit M.

132.    On February 19, Dr. Honigsberg was shocked when she received a letter from Dr. Dorf, dated February 13, terminating her employment without cause.

133.    Dr. Honigsberg's shock continued as she read the letter only to discover that it grossly mischaracterized, and even manufactured, the discussion at the meeting.

Exhibit 2

134. First, the termination letter grossly mischaracterized the accommodations Dr. Honigsberg proposed during the January 28 meeting.

135. The termination letter further made patently false statements about Dr. Honigsberg, including, in part, that the letter: (a) falsely stated that Dr. Honigsberg repeatedly insisted on raising her "concerns about getting consistent childcare;" (b) falsely stated that Dr. Dorf and the Surgeons did not want to discuss Dr. Honigsberg's childcare circumstances; (c) falsely stated that Dr. Honigsberg said she could not handle perfection for surgery; (d) falsely stated that Dr. Honigsberg said she could only handle patients who were going to die anyway; (e) falsely stated that Dr. Honigsberg indicated that trauma surgery does not require a surgeon to perform at their best; (f) falsely stated that Dr. Honigsberg made casual references to the death of patients; (g) falsely stated that Dr. Honigsberg requested an accommodation which would adversely affect patient safety; and (h) falsely stated that Dr. Honigsberg failed to appreciate the need to provide the highest quality of care for patients at all times.

136. Each of the foregoing statements in the termination letter are false. See Exhibit K (Dr. Honigsberg's February 6 email documenting what transpired at the meeting).

137. The termination letter further omits statements made by the surgeons during the meeting as detailed elsewhere herein, supra.

138. Although the termination letter stated that Dr. Honigsberg was terminated without cause, she subsequently received two letters from SNHMC characterizing her termination without cause as a resignation. Exhibit N.

139. Dr. Honigsberg timely filed a Charge of Discrimination, see Exhibit S, with the New Hampshire Commission for Human Rights on May 8, 2020. RSA 354-A:21, III.

140. Dr. Honigsberg timely files the within Complaint. RSA 354-A:21-a, I.

Exhibit 2

## COUNT I: Failure to Accommodate Pursuant to RSA 354-A:7
### *(As Against All Defendants)*

141.    Dr. Honigsberg repeats and realleges all paragraphs set forth above and below.

142.    Claims for disability discrimination under RSA 354-A are construed in conformity with the ADA. Montemerlo v. Goffstown Sch. Dist., SAU No. 19, No. 12-CV-13-PB, 2013 WL 5504141, at *5 (DNH Oct. 4, 2013) (citing McCusker v. Lakeview Rehab. Ctr., Inc., 2003 DNH 158, 6, 7) (citing Petition of Dunlap, 134 N.H. 533, 540, 604 A.2d 945 (1991)).

143.    RSA 354-A provides that "it shall be an unlawful discriminatory practice...[f]or any employer not to make reasonable accommodations for the known physical or mental limitations of a qualified individual with a disability who is an...employee" or "to deny employment opportunities, compensation, terms, conditions, or privileges of employment to a job applicant or employee who is a qualified individual with a disability, if such denial is based on the need of such employer to make reasonable accommodation to the physical or mental impairments of the...employee."  RSA 354-A:7, VII.

144.    A plaintiff bringing a failure to accommodate claim must make a three-prong showing: (1) she is disabled, (2) she was qualified to perform her position's essential functions with or without reasonable accommodation, and (3) the employer knew of her disability yet failed to reasonable accommodate it. Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016).

145.    "Disability" means "(a) a physical or mental impairment which substantially limits one or more of such person's major life activities; (b) a record of having such an impairment; or (c) being regarded as having such an impairment." RSA 354-A:2, IV.

146.    First, Dr. Honigsberg was "disabled" because she was diagnosed in June of 2019 with the psychological condition of Acute Post Traumatic Stress Disorder (PTSD), which substantially limited one or more of her major life activities including, but not limited to, brain

Exhibit 2

function. See 42 U.S.C. §12102(2)(B); 29 C.F.R. §1630(j)(3)(iii) ("it should easily be concluded that… post-traumatic stress disorder… substantially [limits] brain function").

147.    Second, Dr. Honigsberg was a "qualified individual" because she had the requisite skill, experience, education, and other job-related requirements of the surgical position she held, and she was able to perform her job's essential functions with or without reasonable accommodation(s) to her disability as detailed elsewhere herein, supra. Montemerlo v. Goffstown Sch. Dist., SAU No. 19, 12-CV-13-PB, 2013 WL 5504141, at *1 (D.N.H. Oc.t 4, 2013) (citing 29 C.F.R. §1630.2(m)(2012)); 42 U.S.C.A §12111(8).

148.    Third, Defendants knew of Dr. Honigsberg's disability where Dr. Honigsberg put them on notice of same over eight months prior to her termination when, starting on June 3, 2019, Dr. Honigsberg took her initial leave under the FMLA. Moreover, Dr. Honigsberg specifically requested the reasonable accommodation of double-scrubbing more complex surgical procedures on at least four, if not more, occasions: (1) October 31, 2019, when Dr. Ronayne submitted the first SNHHS ADA Certification Form requesting reasonable disability accommodations on Dr. Honigsberg's behalf; (2) December 9, 2019, when Dr. Honigsberg sent, through counsel, a revised request for reasonable disability accommodations; (3) December 23, 2019, when Dr. Honigsberg wrote directly and personally to Dr. Dorf to again request reasonable accommodations; and (4) January 28, 2020, at Dr. Honigsberg's in-person meeting with the Surgeons and Dr. Dorf. These accommodation requests are in addition to the many alternative proposals that Dr. Honigsberg made as detailed herein.

149.    Dr. Honigsberg's accommodation request was facially reasonable, would have enabled Dr. Honigsberg to perform the essential functions of her position, and was feasible for the Defendants under the circumstances. In fact, Dr. Honigsberg previously double-scrubbed with Dr.

Exhibit 2

Flannery and Dr. Jiminez, with <u>no indication</u> at that time that double scrubbing was unreasonable, infeasible, posed an "undue hardship," or posed any impediment to patient care.

150.    Despite Defendants' knowledge of Dr. Honigsberg's disability and her need for an accommodation to the limitations resulting therefrom, and despite that Dr. Honigsberg's requested accommodation was reasonable, feasible, and would have enabled her to perform the essential functions of her position, Defendants refused to accommodate her.

151.    Here, Dr. Honigsberg's request for a reasonable accommodation for her disability triggered "a duty on the part of the employer to engage in an interactive process… to find the best means of accommodating that disability." <u>Enica v. Principi</u>, 544 F.3d 328, 338-9 (1st Cir., 2008).

152.    This, Defendants did not do in any meaningful way. Rather, Defendants approached the "interactive process" in a non-interactive way: they showed up, but they did not interact with Dr. Honigsberg to determine what accommodations could be provided instead rejecting every accommodation or proposal put forth by Dr. Honigsberg without consideration and offering no alternatives.

153.    Merely showing up to the interactive process is not enough to satisfy the law's requirements; rather, both parties must actually meaningfully participate and ***interact***. <u>Montemerlo</u>, 2013 WL 5504141, at *8 (after receiving initial accommodation, employee's separate request for different accommodation was "sufficiently direct and specific" to require "employer to enter into an 'interactive process' with the employee...[to] identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations," because employers must "<u>engage in a **meaningful dialogue** with the employee **to find the best means of accommodating** that disability</u>") (emphasis added).

Exhibit 2

154.    Had a good faith interactive process occurred, Defendants and Dr. Honigsberg could have found a reasonable accommodation that would have enabled her to perform her job's essential functions.

155.    Although Defendants could have feasibly accommodated Dr. Honigsberg's disability without undue hardship, they simply did not want to accommodate Dr. Honigsberg's disability as exemplified, in part, by the following: (a) Dr. Howe's email five weeks into Dr. Honigsberg's leave lamenting "how disruptive" Dr. Honigsberg's disabling, serious medical condition was to him and his surgical colleagues; (b) Mr. Scheff's email six weeks into Dr. Honigsberg's leave describing that, although the surgical group had arranged coverage and planned accordingly, they were nevertheless "frustrated" that they had to do so due to Dr. Honigsberg's continued need for leave time for her disabling, serious medical condition; (c) the verbal and nonverbal communications to Dr. Honigsberg, as alleged herein, from the attendees of the January 28th meeting [e.g., the surgeons did not want to "disrupt the current structure;" the surgeons asked "but we thought you were already cleared [to return to work]?" when Dr. Honigsberg advised she was cleared on December 1 to return with accommodations; and the surgeons asked Dr. Honigsberg when she "plan[ned] on working like the rest of" them]; (d) Defendants' repeated rejection of every accommodation or other proposal put forth by Dr. Honigsberg that would have enabled her to perform her job's essential functions or would have otherwise facilitated her return to work, coupled with Defendants' simultaneous refusal to propose any alternative accommodations; and (e) Dr. Dorf's termination letter stating, in part, "since you requested assistance in performing procedures, I required input from the surgeons who would work with you and proctor you, as their input **_and consent_** was critical to knowing whether your accommodations could be granted."

23

Exhibit 2

156.    In other words, the surgeons did not "consent" to Dr. Honigsberg receiving accommodation, because they just wanted to know when Dr. Honigsberg "plan[ned] on working like the rest of" them.

157.    After months of refusing to work interactively with Dr. Honigsberg did not eliminate her need for accommodation, Defendants resorted to termination without cause and, in the process, manufactured false statements about Dr. Honigsberg to mask their own discriminatory conduct.

158.    Where SNHHS, FMP, and SNHMC were Dr. Honigsberg's joint and/or integrated employers as alleged herein at Paragraphs 8-15, supra, Defendants are each legally responsible for the claims and resulting harms alleged herein. See Torres-Negron v. Merck & Company, Inc., 488 F.3d 34, 42 (1st Cir. 2007) (integrated employers are those with common management, interrelation between operations, centralized control over labor relations, and/or common ownership, although all factors need not be met); see Ahanotu v. Massachusetts Tpk. Auth., 466 F. Supp. 2d 378, 392 (D. Mass. 2006) (an entity is a joint employer if it supervises the employee's day-to-day activities, has the authority to hire or fire employees, promulgates work rules and conditions of employment, controls work assignments, and/or issues operating instructions, although all factors need not be met); Orell v. UMass Mem'l Med. Ctr., Inc., 203 F. Supp. 2d 52, 62 (D. Mass. 2002)[1] ("although the above [ADA and ADEA] definitions do not provide much guidance on the issue of who will be considered an employer, the First Circuit...has recognized that where an entity, by contracting with an employer, acquires control over the employment conditions of the employer's workers, that entity becomes liable as a 'joint employer' under anti-discrimination law").

---

[1] This case was superseded on other grounds, i.e., by statutory change to False Claims Act calling into question whether individual liability was permitted thereunder.

Exhibit 2

159.     As a direct and proximate result of Defendants' unlawful conduct, Dr. Honigsberg

has suffered damages for which she seeks relief including, but not limited to, lost wages, lost

employment benefits, emotional distress, inconvenience, humiliation, loss of life enjoyment,

attorneys' fees, interests, and costs. Dr. Honigsberg also seeks enhanced compensatory damages

for the wanton, malicious, and oppressive manner in which Defendants wrongfully terminated her

employment in violation of RSA 354-A.

## COUNT II: Retaliation Pursuant to RSA 354-A:19
### *(As Against All Defendants)*

160.     Dr. Honigsberg repeats and realleges all paragraphs set forth above and below.

161.     RSA 354-A:19 provides that "it shall be an unlawful discriminatory practice for

any person engaged in any activity to which this chapter applies to discharge, expel, or otherwise

retaliate or discriminate against any person because he has opposed any practices forbidden [i.e.,

refusal to accommodate] under this chapter."

162.     A plaintiff alleging retaliation under RSA 354-A:19 must show three elements: (1)

she engaged in legally protected activity, (2) she suffered an adverse employment action after

engaging in such legally protected activity, and (3) there is a causal connection between the

plaintiff's protected activity and the adverse action suffered upon her. Fernandez-Ocasio v. Wal-

Mart Puerto Rico Inc., 94 F. Supp. 3d 160, 170 (D.P. R. 2015); Carney v. Town of Weare, 15-

CV-291-LM, 2017 WL 680384, at *9 (D.N.H. Feb. 21, 2017).

163.     Here, Dr. Honigsberg engaged in legally protected activity when she requested

reasonable accommodations for her disability from her employer. See RSA 354-A:7, VII. When

Defendants unlawfully refused to accommodate her and meaningfully engage in an interactive

process with her, Dr. Honigsberg opposed that practice by continuously requesting

accommodation.

Exhibit 2

164.    Dr. Honigsberg suffered an adverse employment action, her termination, after she requested various forms of a double-scrubbing accommodation and made other accommodation-related proposals. Dr. Honigsberg reiterated these requests a number of times by requests through counsel, correspondence sent to Dr. Dorf, and in person to the Surgeons during their January 28, 2020, meeting.

165.    Dr. Honigsberg's requests for reasonable accommodation have a causal connection to her termination, as set forth more fully herein in Paragraph 153, supra, and summarized as follows: (a) Defendants were aware of Dr. Honigsberg's disability and need for accommodation; (b) Defendants told Dr. Honigsberg her "absence" was the reason her double-scrubbing accommodation request was denied; (c) Defendants immediately rejected, without consideration, all of Dr. Honigsberg's requested accommodations and alternative proposals throughout the entirety of the interactive process; (d) Defendants failed to propose a single accommodation of their own throughout the entirety of the interactive process; and (e) Defendants, in response to Dr. Honigsberg's proposed accommodations, retorted "we're [the surgical practice] way past that point" and then asked of her "when do you plan on working like the rest of us?" when she stated that she was cleared to return to work with accommodations.

166.    Where SNHHS, FMP, and SNHMC were Dr. Honigsberg's joint and/or integrated employers as alleged herein at Paragraphs 8-15, supra, Defendants are each legally responsible for the claims and resulting harms alleged herein. Torres-Negron v. Merck & Company, Inc., 488 F.3d 34, 42 (1st Cir. 2007) (integrated employers are those with common management, interrelation between operations, centralized control over labor relations, and/or common ownership, although all factors need not be met); see Ahanotu v. Massachusetts Tpk. Auth., 466 F. Supp. 2d 378, 392 (D. Mass. 2006) (an entity is a joint employer if it supervises the employee's day-to-day activities,

Exhibit 2

has the authority to hire or fire employees, promulgates work rules and conditions of employment, controls work assignments, and/or issues operating instructions, although all factors need not be met); Orell v. UMass Mem'l Med. Ctr., Inc., 203 F. Supp. 2d 52, 62 (D. Mass. 2002) ("although the above [ADA and ADEA] definitions do not provide much guidance on the issue of who will be considered an employer, the First Circuit...has recognized that where an entity, by contracting with an employer, acquires control over the employment conditions of the employer's workers, that entity becomes liable as a 'joint employer' under anti-discrimination law").

167.    As a direct and proximate result of Defendants' unlawful conduct, Dr. Honigsberg has suffered damages for which she seeks relief including, but not limited to, lost wages, lost employment benefits, emotional distress, inconvenience, humiliation, loss of life enjoyment, attorneys' fees, interests, and costs. Dr. Honigsberg also seeks enhanced compensatory damages for the wanton, malicious, and oppressive manner in which Defendants wrongfully terminated her employment in violation of RSA 354-A.

### COUNT III: Termination on Account of Actual Disability Pursuant to RSA 354-A:7, I
*(As Against All Defendants)*

168.    Dr. Honigsberg repeats and realleges all paragraphs set forth above and below.

169.    RSA 354-A:7, I provides that it is "an unlawful discriminatory practice...[f]or an employer, because of the...physical or mental disability...of any individual, to...discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

170.    A claim stemming from termination on account of actual disability requires a plaintiff to show that (1) she was "disabled," (2) she was able to perform the essential functions of her job with or without a reasonable accommodation, and (3) she suffered an adverse employment action "in whole or in part because of [her] disability." Lang, 813 F.3d at 458 (1st Cir. 2016).

Exhibit 2

171.    Dr. Honigsberg was "disabled," and she was able to perform the essential functions of her job, as both are alleged fully elsewhere herein, <u>supra</u>.

172.    Dr. Honigsberg further suffered an adverse employment action, termination, on account of her disability and corresponding need for accommodation thereto as alleged fully elsewhere herein, <u>supra</u>.

173.    Where SNHHS, FMP, and SNHMC were Dr. Honigsberg's joint and/or integrated employers as alleged herein at Paragraphs 8-15, <u>supra</u>, Defendants are each legally responsible for the claims and resulting harms alleged herein. <u>See</u> <u>Torres-Negron v. Merck & Company, Inc.</u>, 488 F.3d 34, 42 (1st Cir. 2007) (integrated employers are those with common management, interrelation between operations, centralized control over labor relations, and/or common ownership, although all factors need not be met); <u>see</u> <u>Ahanotu v. Massachusetts Tpk. Auth.</u>, 466 F. Supp. 2d 378, 392 (D. Mass. 2006) (an entity is a joint employer if it supervises the employee's day-to-day activities, has the authority to hire or fire employees, promulgates work rules and conditions of employment, controls work assignments, and/or issues operating instructions, although all factors need not be met); <u>Orell v. UMass Mem'l Med. Ctr., Inc.</u>, 203 F. Supp. 2d 52, 62 (D. Mass. 2002) ("although the above [ADA and ADEA] definitions do not provide much guidance on the issue of who will be considered an employer, the First Circuit...has recognized that where an entity, by contracting with an employer, acquires control over the employment conditions of the employer's workers, that entity becomes liable as a 'joint employer' under anti-discrimination law").

174.    As a direct and proximate result of Defendants' unlawful conduct, Dr. Honigsberg has suffered damages for which she seeks relief including, but not limited to, lost wages, lost employment benefits, emotional distress, inconvenience, humiliation, loss of life enjoyment, attorneys' fees, interests, and costs. Dr. Honigsberg also seeks enhanced compensatory damages

Exhibit 2

for the wanton, malicious, and oppressive manner in which Defendants wrongfully terminated her

employment in violation of RSA 354-A.

**COUNT IV: Willful Retaliation in Violation of FMLA**
**Pursuant to 29 USC §§ 2615, 2617(c) and 2601**
*(As Against All Defendants)*

175.    Dr. Honigsberg repeats and realleges all paragraphs set forth above and below.

176.    The FMLA was enacted to ensure "job security for employees who have serious

health conditions that prevent them from working for temporary periods" by enshrining in statute

an employee's right to "take reasonable leave for medical reasons," as well as to ensure "equal

employment opportunity for women and men," where "the primary responsibility for family

caretaking often falls on women, and such responsibility affects the working lives of women more

than...men." <u>See</u> 29 USC § 2601(a)(4), (b)(2), (b)(5), and (a)(5), respectively.

177.    To these ends, the FMLA entitles an "eligible employee" to 12 weeks of leave

during a 12-month period for "a serious health condition that makes the employee unable to

perform the functions of the position of such employee." <u>See</u> 29 USC § 2612(a)(1)(D). An "eligible

employee" is one who was employed for at least 12 months prior to the requested leave, who

performed at least 1,250 hours of service prior to the requested leave, and who is employed by an

employer at a worksite with 50 or more employees who are employed within 75 miles of that

worksite. <u>See</u> 29 USC § 2611(2)(A) and (B).

178.    Where Defendants permitted Dr. Honigsberg to take 12 weeks of FMLA leave, it is

indisputable that she was an "eligible employee" within the meaning of the FMLA. In any event,

Dr. Honigsberg met the criteria of an "eligible employee." <u>See</u> ¶ 44, <u>supra</u>.

179.    The statute provides that "it shall be unlawful for any employer to" either (1)

"<u>interfere</u> with [or] <u>restrain</u>...the exercise of or the attempt to exercise, any right provided under

29

Exhibit 2

this subchapter," or (2) "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." See 29 USC §2615.

180.    Accordingly, the "FMLA prohibits retaliation against employees who take FMLA leave." Duryea v. MetroCast Cablevision of New Hampshire, LLC, 2017 WL 1450219, at *13 (D.N.H. Apr. 21, 2017) (citing Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 8 (1st Cir. 2012)). "For example, 'employers cannot use the taking of FMLA leave as a **negative factor** in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies.'" Id. (emphasis added).

181.    A plaintiff alleging FMLA retaliation must show: "(1) she availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between her protected conduct and the adverse employment action." Duryea, supra, at *13 (citing Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 719 (1st Cir. 2014)). Lastly, an employer commits a "willful" violation of the FMLA when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 33 (1st Cir. 2003) (establishing the "willfulness" standard in the First Circuit).

182.    First, Dr. Honigsberg availed herself of a protected FMLA right when she, as an eligible employee, took 12 weeks of FMLA leave for her PTSD, a serious health condition.

183.    Second, Dr. Honigsberg was adversely affected by an employment decision where Defendants **_refused to accommodate_** her disability in any way upon her scheduled work return, opting to **_terminate her instead_** despite her ability to perform her position's essential functions with reasonable accommodation, **_because_** she engaged in legally protected **_leave taking_**. See Crevier v. Town of Spencer, 600 F. Supp. 2d 242, 261 (D. Mass. 2008) (jury could reasonably find

Exhibit 2

that <u>employer's refusal to accommodate</u> disabled employee and its <u>termination</u> of her employment – even after employer provided employee accommodations to disability and granted her request for FMLA leave for a serious health condition – was "<u>directly related to her requests for FMLA leave</u>") (emphasis added).

184.     Third, a causal connection exists between Dr. Honigsberg's FMLA leave taking and Defendants' refusal to accommodate her and termination of her employment: Defendants ***<u>refused to accommodate</u>*** her disability in any way upon her scheduled work return, opting to ***<u>terminate her instead</u>*** despite her ability to perform her position's essential functions with reasonable accommodation, ***<u>because</u>*** she engaged in legally protected ***<u>leave taking</u>***.

185.     The very first time that Dr. Honigsberg requested an accommodation (double scrubbing) to disability upon her work return, her accommodation request was explicitly denied due to her "absence" from work:

> ...[W]e are not able to accommodate your request to double scrub. To require the surgical team to double scrub **<u>with *you*</u>** would be an undue hardship [because] ***<u>[y]our absence has resulted in less surgical resources</u>***."

<u>See</u> Exhibit F (Nov. 12, 2019, denial of requested workplace accommodation of double scrubbing).

186.     Significantly, the letter denying Dr. Honigsberg's accommodation request did **<u>not</u>** state that no member of the surgical team could participate in double scrubbing due to inadequate surgical resources. Rather, the letter makes clear that Defendant would not "require the surgical team to double scrub **with you**," i.e., **with Dr. Honigsberg**, because of her "**<u>absence</u>**."

187.     After Dr. Honigsberg had been out on leave for only 5 weeks, members of Defendants' surgical team – the same individuals with whom Dr. Honigsberg sought to double scrub – expressed their animosity toward Dr. Honigsberg's protected FMLA leave taking. Dr. Howe, copying his colleagues including Dr. Tsaparlis, Dr. Gupta, and Dr. Jiminez, sent an email,

Exhibit 2

with "Practice Disruption" as the subject line, to Dr. Dorf and other administration members which, in relevant part, read:

> I'm sure FMP administration realizes how **disruptive it is to have a provider go out on sudden leave** without prior notice. I'm also sure you realize how **disruptive it is when there is no return date** for that provider. We were advised today was the return date but that turned out to be false. We are CONSTANTLY changing clinic, OR and call schedules [due to the absent provider]. This puts a strain on providers and support staff. I realize there are privacy concerns but we have heard from NO ONE since **this** began.

See Exhibit R (July 9, 2019, email written by Dr. Howe).

188.    About a week later, Mr. Scheff (FMP administration) met with the surgical team, after which Mr. Scheff reported directly to Dr. Dorf that "the [surgical] group was frustrated that she did not come back when expected [and] therefore clinic and call schedules needed to be changed quickly." Id.

189.    Evidently, the surgical teammates that Dr. Honigsberg asked to double scrub with her were focused on being "frustrated" by the "disruption" and "strain" that Dr. Honigsberg's disabling, serious health condition imposed on them.

190.    The same members of the surgical team who openly expressed, directly to Dr. Dorf, their animosity toward Dr. Honigsberg's protected FMLA leave taking are the same individuals that Dr. Dorf asserted had to "consent" to accommodating Dr. Honigsberg's disability upon her return to work: "In order to consider your accommodation request to return to work...I require input from the surgeons who would work with you and would proctor you, as their input and **consent** is critical." More specifically, Dr. Dorf asserted that Dr. Howe (the author of the July 9, 2019 "Practice Disruption" email) along Dr. Tsaparlis (copied on said email) must give their input and consent to Dr. Honigsberg's requested accommodations. Dr. Dorf also asserted that Dr. Flannery, with whom Dr. Honigsberg had double scrubbed prior to ever taking FMLA leave or

Exhibit 2

becoming disabled, had to give his input and consent to Dr. Honigsberg's requested accommodations, including double scrubbing.

191.    Indeed, nearly two months after Dr. Honigsberg had been cleared to return to work with reasonable accommodation, she met with Dr. Dorf, Dr. Howe, Dr. Tsaparlis, and Dr. Flannery (the four meeting attendees) on January 28, 2020, to hear their "input" on, and whether they gave their "consent" to, her requested accommodations, including double scrubbing.

192.    That Defendants refused to accommodate Dr. Honigsberg's disability **because** she availed herself of protected FMLA leave taking is evident from what occurred at the January 28th meeting including, but not limited to, that: (1) Dr. Honigsberg proposed several possible accommodations to her disability, all of which were immediately rejected by the meeting attendees, who suggested not even one accommodation in return; (2) with respect to Dr. Honigsberg's request for a double scrubbing accommodation, the meeting attendees were not ***willing*** to call another surgeon in at night for double scrubbing; (3) when Dr. Honigsberg suggested she pay for a PA out of pocket to assist her with procedures, the meeting attendees were not ***willing*** to "disrupt the current structure"; (4) when Dr. Flannery asked Dr. Honigsberg when she could return to work, she advised she had been cleared to return as of December 1st with accommodations and that she would return as soon as accommodations cleared by her provider were approved, the meeting attendees rejected her need for accommodation and expressed their distaste with her delayed return, asking "but we thought you were already cleared [to return to work]?"; and (5) when Dr. Honigsberg, again, explained that she was cleared and ready to return to work with accommodations, Dr. Howe asked her, "when do you plan on **working like the rest of us**?"

193.    That Defendants refused to accommodate Dr. Honigsberg's disability **because** she availed herself of protected FMLA leave taking is further evident where, as alleged elsewhere

Exhibit 2

herein, supra: Defendants' surgical providers previously engaged in double scrubbing, including when Dr. Honigsberg double scrubbed (before ever taking FMLA leave) with Dr. Flannery and Dr. Jiminez; Defendants' surgical resources had grown during the time that Dr. Honigsberg was away from work; and double scrubbing is common in the surgical profession, particularly in cases where a surgeon is returning to practice after an absence.

194.    Lastly, Defendants' conduct, as described herein, supra, reflects a "willful" violation of the FMLA, where Defendants knew and/or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. By virtue of having given Dr. Honigsberg FMLA leave time, Defendant evidenced at least *some* knowledge of its FMLA obligations.

195.    Despite this, Defendant behaved unreasonably and recklessly disregarded the issue of whether its conduct was prohibited by the FMLA's anti-retaliation provision when it sought the "input and consent" of other surgeons before it would provide her a double scrubbing accommodation, where those surgeons had already plainly expressed animosity to Dr. Honigsberg's FMLA protected absence.

196.    Well before Defendant sought the "input and consent" of other surgeons to her requested double scrubbing accommodation, Defendant behaved unreasonably and recklessly disregarded the issue of whether its conduct was prohibited by the FMLA's anti-retaliation provision when – in Defendant's first denial of Dr. Honigsberg's requested double scrubbing accommodation – Defendant refused to provide that accommodation specifically to Dr. Honigsberg because of her prior, FMLA related absence. See Exhibit F (Dr. Dorf's statement that "to require the surgical team to double scrub **with you** [Dr. Honigsberg] would be an undue hardship [because] **your absence** has resulted in less surgical resources"). Notably, Defendants'

Exhibit 2

<u>first</u> denial of Dr. Honigsberg's requested double scrubbing accommodation did <u>not</u> mention that the "input" and "consent" of the surgical team was sought or needed.

197.    As a direct and proximate result of Defendants' unlawful and willful conduct, Dr. Honigsberg has suffered damages for which she seeks relief including, but not limited to, lost wages, interest on the lost wages, liquidated damages in an additional amount equal to the sum of the lost wages and interest, and attorneys' fees and costs.

## **REQUEST FOR RELIEF:**

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

A.    Schedule this matter for trial by jury, and after trial;

B.    Find that the Defendant violated Plaintiff's rights under the New Hampshire Law Against Discrimination (RSA 354-A) and under the federal Family and Medical Leave Act (29 USC §§ 2615 and 2601).

C.    Award Plaintiff damages for her economic losses including, without limitation, all lost wages (back and front pay), lost employment benefits, and lost earning capacity;

D.    Award Plaintiff compensatory damages including, without limitation, emotional distress, humiliation, inconvenience, and loss of enjoyment of life;

E.    Award Plaintiff enhanced compensatory damages for Defendant's wanton, malicious, or oppressive conduct;

F.    With regard to her FMLA claim, award Plaintiff: (a) any wages, salary, employment benefits, or other compensation denied or lost to Dr. Honigsberg by reason of Defendants' violation; (b) the interest on the foregoing amounts at the prevailing rate at the time

Exhibit 2

of calculation; (c) an additional amount as liquidated damages equal to the sum of the foregoing amounts and interest; and (d) for such equitable relief as may be appropriate;

      G.      Award Plaintiff her reasonable attorney's fees, interest, and costs;

      H.      Award Plaintiff all other damages available to Plaintiff at law, and

      I.      Award Plaintiff such other relief as this Honorable Court deems equitable and just.

 

                                  Respectfully submitted,
                                  Elizabeth Honigsberg, M.D.
                                  By Her Attorneys
                                  Shaheen & Gordon

Dated:  October 25, 2022      By:     /s/ Samantha J. Heuring, Esq. (Bar #272321)
                                  353 Central Ave., Suite 200
                                  P.O. Box 977
                                  Dover, NH 03821
                                  (603) 749 – 5000
                                  sheuring@shaheengordon.com

## **Certificate of Service**

     I hereby certify that I have served a copy of the foregoing on counsel for defendants via the court's e-file system.

                              /s/Samantha J. Heuring, Esq.

Exhibit 2